STATE OF NORTH CAROLINA v. JOHN R. RATLIFF

No. 43

(Filed 16 June 1972)

1. Criminal Law § 84— evidence unconstitutionally obtained — exclusion

Evidence unconstitutionally obtained is excluded in both state and federal courts as an essential to due process.

2. Criminal Law § 84— evidence unlawfully obtained — exclusion — statutes

G.S. 15-27 and G.S. 15-27.1, in accord with constitutional requirements, render incompetent all evidence obtained (1) in the course of a search, (2) without a legal search warrant, (3) under conditions requiring a search warrant.

3. Constitutional Law § 21; Searches and Seizures § 1— unreasonable search and seizure

The Constitution does not prohibit all searches and seizures but only those which are unreasonable.

4. Criminal Law § 84; Searches and Seizures § 1— search of automobile — probable cause

The right to search an automobile without a warrant does not depend on the right to arrest but depends on the existence of probable cause to make the search.

5. Criminal Law § 84; Searches and Seizures § 1— probable cause to search automobile — officer's choice

If there is probable cause to search an automobile the officer may either seize and hold the vehicle before presenting the probable cause issue to a magistrate, or he may carry out an immediate search without a warrant.

---

State v. Ratliff

---

6. **Criminal Law § 84; Searches and Seizures § 1— search of automobile — probable cause**

An officer had probable cause to believe that defendant's car contained contraband of some sort, and a search of the car without a warrant was lawful, where the officer observed defendant, apparently nude, in a parking lot of a business establishment at midnight, defendant tried to drive away when the officer stopped, and defendant was seen brushing something out of his lap onto the floorboard of the car and then appeared to kick something under the seat with his left leg and foot; consequently the fruits of the search, including a pistol found under the seat, were admissible in defendant's trial for homicide.

7. **Criminal Law § 75— indigent defendant — arrest for petty misdemeanor — statements relating to capital felony — right to counsel**

Former G.S. 7A-451 and the decision of *State v. Lynch,* 279 N.C. 1, did not render inadmissible in a first degree murder prosecution statements made by an indigent defendant to the arresting officer without benefit of counsel, where defendant had been arrested only for the petty misdemeanor of carrying a concealed weapon when the statements were made and the officer had no knowledge that a capital felony had been committed, since at all times pertinent to this case, an indigent charged with a petty misdemeanor was not entitled to the services of counsel at the State's expense.

8. **Criminal Law § 75— arrest for misdemeanor — statements relating to capital felony — in-custody interrogation**

Where defendant was arrested for carrying a concealed weapon, a pistol, and the arresting officer, upon discovering that three of the pistol's nine chambers were empty, asked defendant where he had been and what he had been shooting at, defendant's unexpected statement that he had shot a woman, defendant's further statement, in response to the officer's attempt to get more definite information, that the officer was a cop and it was for him to locate the victim, and defendant's volunteered statement that the woman might not be dead and the officer could be a hero, *held* not the result of "in-custody interrogation" within the purview of the *Escobedo* and *Miranda* decisions; consequently, the statements were properly admitted in defendant's trial for first degree murder although defendant was an indigent, was not represented by counsel and had not waived counsel when they were made.

Justice HIGGINS dissenting.

APPEAL by defendant from *Bailey, J.,* 6 December 1971 Criminal Session, CUMBERLAND Superior Court.

Defendant was tried upon a bill of indictment, proper in form, charging him with the murder of Marilyn Best on 24 June 1971. Being indigent, he was represented by the public defender.

The State's evidence tends to show that on the night of 24 June 1971 Deputy Sheriff Douglas Hartley was on patrol on Highway 401 south. At approximately 12:15 a.m. he saw defendant sitting in a gray 1964 Thunderbird in the parking lot of Johnson Furniture Store on Raeford Road. The dome light of the car was on and defendant was apparently nude. Officer Hartley pulled into the parking lot and stopped defendant when he started to pull out. The officer observed defendant "making a motion like he was knocking something out of his lap onto the floorboard of the car." The officer got out of his vehicle, approached defendant's car on the driver's side, and observed he was dressed only in Bermuda shorts. He was sitting under the wheel with a knife in his hand. "I asked him to lay the knife down and open the car door and when he did this he made a kicking motion with his left leg and foot as if he were kicking something under the seat." He laid the knife on the dashboard of the car, and when he got out the officer reached under the seat of the car and found a .22 caliber revolver. It was located directly under the driver's seat on the extreme left where the frame joins the floorboard of the car. The weapon (State's Exhibit 1) was a High Standard .22 caliber, nine-shot revolver, serial No. 2206367. Defendant stated his name upon request, and the officer informed him he was under arrest for carrying a concealed weapon. The officer then read defendant's constitutional rights to him from a prepared copy he kept in his patrol car, and defendant acknowledged that he understood his rights.

Officer Hartley then broke the weapon down and found that it contained six .22 long rifle shells and three empty chambers. The officer then asked defendant where he had been. Upon objection the court excused the jury and, after conducting a voir dire examination during which only Officer Hartley testified, found facts substantially as above narrated and further found that Officer Hartley "had reasonable grounds to believe that something had been concealed under the floor of the car and . . . that it was reasonable to believe that said article constituted the fruits or evidence of a crime." In addition, the court found "that the officer had reasonable grounds to believe that if said vehicle was not properly searched it would be moved and such evidence or fruits of crime as might be in it would be disposed of and would never again be available to the police." The court further found that at the time of the

State v. Ratliff

arrest, and prior to making any statement, defendant had been given the *Miranda* warnings and had said he understood his rights; that defendant was not suspected of any crime which would involve a penalty of over six months; that he was not required to waive his rights to an attorney or other constitutional rights in writing; and that there was no showing that defendant was an indigent person at that time. Based on such findings the court concluded that Officer Hartley had probable cause to search defendant's automobile without a warrant and that defendant's answer in response to the officer's questions should be admitted into evidence.

The jury returned to the box and Officer Hartley continued his testimony as follows: "After I charged Mr. Ratliff with carrying a concealed weapon, I asked him where he had been and he said out off Fisher Road and I asked him what he shot out off Fisher Road and he said he had just shot a woman." The officer then asked him for the location off Fisher Road where a woman had been shot and, over objection, the officer was permitted to testify: "He told me then, at that point, that I was a cop, and for me to find out." Officer Hartley asked no more questions at that time and busied himself filling out a storage report to have defendant's automobile stored. Defendant volunteered an unsolicited statement that the officer "should try to find the woman, she may not be dead and then I could be a hero." This statement prompted Officer Hartley to try again, without success, to learn the woman's name and the location.

At this point Officer Hartley made an examination of defendant's car and testified, over objection, that he found a hatchet on the back floorboard of the car, a lady's necklace-type watch on the floorboard at the front on the right side and some wet one-dollar bills stuffed between the seat and console on the driver's side of the automobile. Defendant said the watch belonged to his wife, and Officer Hartley left it in the car on the right front floorboard where he found it.

Officer Hartley then took defendant to the Cumberland County Sheriff's Office. Around 9 a.m. that same morning, Officer Hartley returned to the Johnson Furniture Store parking lot where he found two spent .22 long rifle casings "in an area that would have been in front and to the left" of the point where defendant's car was parked when the officer first arrived on the scene.

The following morning while cleaning his patrol car, Officer Hartley examined the back seat area where defendant sat the previous night on the trip to the Sheriff's office and found, behind the back seat, an identification card similar to those issued to Army dependents with a picture of Marilyn Best on it and bearing the following inscription: "Issued on 8th June, 1970, expiration 27th May, 1973, issued to Marilyn Best, color of eyes, brown, color of hair, brown, five-nine, weighing 140. Date of birth, 26 October 1951. Grade, name, Private Samuel W. Best."

In response to a radio call during the day of June 24, Officer Hartley went to the trailer home of Marilyn Best with a man named Paul Cunningham, a neighbor of Mrs. Best. The trailer door was open. Inside, Marilyn Best lay half in and half out of an easy chair. Her hair was matted with blood, and she had a wound on the outside of the left thigh. She was dressed in panties and some type of dress or nightgown which was above her waist. There were two bullet holes in the wall behind the chair. Beside the kitchen sink lay an empty lady's pocketbook. The sink was full of water and the contents of the pocketbook, "papers and things," were floating in it.

Mrs. Best was having difficulty breathing. Her head was slumped over the left arm of the chair. She was moaning and apparently unconscious. Mrs. Best died in Duke Hospital five days later as a result of her wounds.

Paul Cunningham, neighbor and acquaintance of Marilyn Best and her husband, testified that he was the owner of the .22 caliber pistol taken from defendant's car by Officer Hartley and that he had loaned the pistol to Mrs. Best on the Saturday before she was shot. He said she wanted to borrow it for her protection and was apprehensive because a car had stopped two or three times in her driveway. This witness further stated that at approximately 5:33 a.m. on June 24 he was driving by the Best trailer and saw the lights on and the front door open; that he stopped to investigate, saw Mrs. Best moaning and apparently unconscious and called the officers.

Samuel Best, husband of the deceased, identified the lady's necklace-type watch found in defendant's car (State's Exhibit 2) as the property of his wife. He said it was given to her by her father and she had worn it many times. Mr. Best also

identified State's Exhibit 5 as the Army dependents identification card issued to his wife.

SBI Agent E. B. Pierce testified that in his opinion the two .22 caliber cartridge casings found on the parking lot where defendant was parked when apprehended (State's Exhibits 4A and 4B) had been fired in the .22 caliber revolver found in defendant's car (State's Exhibit 1).

Defendant offered no evidence. The jury convicted him of murder in the first degree and recommended life imprisonment. Judgment was pronounced accordingly and defendant appealed to the Supreme Court assigning errors noted in the opinion.

*James Godwin Taylor, Assistant Public Defender, for the defendant appellant.*

*Robert Morgan, Attorney General, William F. O'Connell, Assistant Attorney General, for the State of North Carolina.*

HUSKINS, Justice.

Defendant's first, second and third assignments of error are based on the contention that the warrantless search of his automobile was illegal. Hence, defendant argues, the fruits of the search were tainted and inadmissible as evidence against him.

[1, 2] Unreasonable searches and seizures are prohibited by the Fourth Amendment to the Constitution of the United States. Since the decision in *Mapp v. Ohio,* 367 U.S. 643, 6 L.Ed. 2d 1081, 81 S.Ct. 1684 (1961), "all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court." Thus, evidence unconstitutionally obtained is excluded in both state and federal courts as an essential to due process—not as a rule of evidence but as a matter of constitutional law. *State v. Colson,* 274 N.C. 295, 163 S.E. 2d 376 (1968). Such was law in North Carolina long before the decision in *Mapp.* G.S. 15-27 and G.S. 15-27.1 provide, *inter alia,* that no facts discovered or evidence obtained in the course of any search without a legal search warrant, made under conditions requiring the issuance of a search warrant, shall be competent as evidence in the trial of any action. These statutes, in accord with constitutional requirements, render incompetent all evidence obtained (1) in the course of a

search, (2) without a legal search warrant, (3) under conditions requiring a search warrant. *State v. Coffey*, 255 N.C. 293, 121 S.E. 2d 736 (1961) ; *State v. Stevens*, 264 N.C. 737, 142 S.E. 2d 588 (1965).

[3] The Constitution does not prohibit all searches and seizures but only those which are unreasonable. *Carroll v. United States*, 267 U.S. 132, 69 L.Ed. 543, 45 S.Ct. 280, 39 A.L.R. 790 (1925) ; *Elkins v. United States*, 364 U.S. 206, 4 L.Ed. 2d 1669, 80 S.Ct. 1437 (1960). An unreasonable search has been defined as "an examination or inspection without authority of law of one's premises or person, with a view to the discovery of . . . some evidence of guilt, to be used in the prosecution of a criminal action." 47 Am. Jur., Searches and Seizures, § 52.

[4] In recognition of the mobility of automobiles, a search of an automobile without a warrant is constitutionally permissible *if there is probable cause to make the search. Carroll v. United States, supra; Brinegar v. United States*, 338 U.S. 160, 93 L.Ed. 1879, 69 S.Ct. 1302 (1949) ; *Chimel v. California*, 395 U.S. 752, 23 L.Ed. 2d 685, 89 S.Ct. 2034 (1969). The search of an automobile *on probable cause* proceeds on a theory entirely different from that justifying the search *incident to an arrest*. "The right to search and the validity of the seizure are not dependent on the right to arrest. They are dependent on the reasonable cause the seizing officer has for belief that the contents of the automobile offend against the law." *Carroll v. United States, supra*. "Automobiles, because of their mobility, may be searched without a warrant upon facts not justifying a warrantless search of a residence or office (citations omitted). The cases so holding have, however, always insisted that the officers conducting the search have 'reasonable or probable cause' to believe that they will find the instrumentality of a crime or evidence pertaining to a crime before they begin their warrantless search." *Dyke v. Taylor Implement Manufacturing Co.*, 391 U.S. 216, 20 L.Ed. 2d 538, 88 S.Ct. 1472 (1968).

[5] If there is probable cause to search an automobile, the officer may either seize and hold the vehicle before presenting the probable cause issue to a magistrate, or he may carry out an immediate search without a warrant. "For constitutional purposes we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate

search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment." *Chambers v. Maroney,* 399 U.S. 42, 26 L.Ed. 2d 419, 90 S.Ct. 1975 (1970). *See* Note, *Chambers v. Maroney:* New Dimensions in the Law of Search and Seizure, 46 Ind. L. J. 257 (1971). *Compare Coolidge v. New Hampshire,* 403 U.S. 443, 29 L.Ed. 2d 564, 91 S.Ct. 2022, reh. den. 404 U.S. 874, 30 L.Ed. 2d 120, 92 S.Ct. 26 (1971).

[6] Applying the foregoing legal principles to the facts in this case, we hold that Officer Hartley acted on reasonable grounds and with probable cause when he searched defendant's car on the spot. The officer observed defendant, apparently nude, in a parked car on the parking lot of a business establishment at midnight. Any alert officer under such circumstances would stop and investigate. When this officer stopped, defendant tried to drive away. Then he was seen brushing something out of his lap into the floorboard of the car. Then he appeared to kick something under the seat with his left leg and foot. Such suspicious, furtive conduct would alert any officer to the fact that defendant had something to hide. The totality of these exigent circumstances was sufficient to lead a man of prudence and caution to believe defendant's car contained contraband of some sort, and Officer Hartley was fully justified in the examination of the car which he made. He would have been remiss in the performance of his duties as a law enforcement officer had he done otherwise. Thus, given probable cause, the search which Officer Hartley made was reasonable by Fourth Amendment standards, and the fruits of the search were properly admitted in evidence. *Chambers v. Maroney, supra; State v. Hill,* 278 N.C. 365, 180 S.E. 2d 21 (1971); *State v. Dobbins,* 277 N.C. 484, 178 S.E. 2d 449 (1971); *State v. v. Jordan,* 277 N.C. 341, 177 S.E. 2d 289 (1970). These assignments of error are overruled.

The trial court, over defendant's objection, admitted for jury consideration the following statements made to Officer Hartley: (1) Defendant's statement that he had shot a woman out off Fisher Road; (2) defendant's statement that Officer Hartley was a cop and for him to find out for himself the location off Fisher Road where the shooting took place; and (3) defendant's statement that Officer Hartley should try to find the woman because she may not be dead and Hartley could be a hero. Defendant contends these statements were erroneously admitted because he was an indigent, charged with a capital

offense, undergoing in-custody interrogation by an officer, and was entitled to counsel during such interrogation under G.S. 7A-451, citing *State v. Lynch,* 279 N.C. 1, 181 S.E. 2d 561 (1971), as authority for his position. Admission of these incriminating statements constitutes defendant's fourth assignment of error.

[7, 8]　In our view, neither G.S. 7A-451 (1969) nor the decision of this Court in *State v. Lynch, supra,* have any application to the factual circumstances of this case. Furthermore, although the officer warned defendant of his constitutional rights and defendant stated he understood them, the decisions of the United States Supreme Court in *Escobedo v. Illinois,* 378 U.S. 478, 12 L.Ed. 2d 977, 84 S.Ct. 1758 (1964), and in *Miranda v. Arizona,* 384 U.S. 436, 16 L.Ed. 2d 694, 86 S.Ct. 1602 (1966), have no application to the factual circumstances revealed by this record. Here, an officer on night patrol stopped to investigate the unusual circumstances of an apparently nude man in a parked car on the parking lot of a business establishment at midnight. In consequence of what the officer saw and his discovery of the pistol, he arrested defendant for carrying a concealed weapon, a violation of G.S. 14-269 (1969) and a petty misdemeanor.

At all times pertinent to this case, an indigent charged with a petty misdemeanor was not entitled to the services of counsel at the State's expense. G.S. 7A-451(1) (1969); *State v. Morris,* 275 N.C. 50, 165 S.E. 2d 245 (1968).

At the time Officer Hartley arrested defendant he had no knowledge that Marilyn Best had been murdered. He did not suspect defendant of murder. He had no reason to believe that defendant had committed a capital felony and did not interrogate him with reference to such a crime. Even so, immediately upon informing defendant that he was under arrest for carrying a concealed weapon, the officer fully informed him of his constitutional rights and defendant said he understood them. His subsequent police-baiting conduct clearly indicated that he did understand them, that he answered only those questions he wanted to answer, and that he felt no compulsion to answer any of them.

The conversation between Officer Hartley and defendant was not an in-custody interrogation of a murder suspect. While awaiting the wrecker which would take defendant's automobile

to the sheriff's office, Hartley "broke down" the pistol which defendant had concealed when the officer approached. When he observed that three of its nine chambers were empty, he asked defendant where he had been and what he had been shooting at. Considering the misdemeanor charge against defendant and his unusual attire for midnight travel, this offhand inquiry was not illogical. Defendant's casual and astonishing reply was, "I just shot a woman." When the officer asked who and where the victim was, defendant replied that he did not know her name and that it was out on Fisher Road. The officer's attempt to get more definite information was unsuccessful. Defendant told him he was a cop and for him to find out.

After that comment from defendant, Officer Hartley devoted his attention to filling out a storage report to have defendant's automobile stored; and while thus engaged, defendant *volunteered* the information that the woman might not be dead and that Hartley could be a hero if he found her.

At this disclosure it is rather apparent that Officer Hartley did not know whether he had on his hands a lunatic, a drug addict, a police baiter, a practical joker, or a felon. Obviously, the officer could not ignore the possibility that somewhere near Fisher Road the life of a wounded woman might depend on receiving immediate aid. He did what any officer and any other person of good will would have done when he tried to learn the woman's identity and where she could be found. To suggest that such inquiries must await a determination of indigency and appointment of counsel is unrealistic.

To such inquiries by the officer, however, defendant, in obscene language, referred to the officer as a pig and refused any further information. At one time he said, "What if I told you her name began with the letter A ? What if I told you her name began with a B ?" After those baiting questions from defendant Officer Hartley ceased his efforts to ascertain the woman's whereabouts. He went back to defendant's car where he found a hatchet on the floor of the back seat and a lady's necklace watch, which defendant said belonged to his wife, on the floor of the front seat. He also found three or four wet, folded dollar bills which he gave to defendant with an admonition against leaving money in the car.

About this time the wrecker arrived and defendant inquired whether Hartley was going to charge him with murder. Hartley told him he was under arrest for carrying a concealed weapon and he would not be arrested for murder until they found a body. Defendant said "that would be good, he could spend a lot of time in the penitentiary with some good cons and learn himself a trade like bank robbery or something of that nature." Hartley then asked defendant why he shot the woman and was informed, in vulgar language, that she would not consent to have intercourse with him.

En route to the jail defendant again told the officer that he should try to find the woman. Then he added, "Oh, hell, I know she's dead because I shot her five times." At the police station, Hartley told defendant to tell Sergeant Norton what he had told him about shooting a woman and defendant said, "I didn't shoot a woman, I shot a man."

The foregoing recital is a resume of the evidence which the judge heard on voir dire in the absence of the jury. Before the jury, with reference to his conversation with defendant, Hartley was permitted to say only that defendant told him he had shot a woman off Fisher Road; that Hartley was a cop and it was for him to find out where; and that he should try to find the woman because she might not be dead and he would be a hero.

This narration of the questions put to defendant in the deserted parking lot depicts a situation entirely foreign to "in-custody interrogation" discussed and condemned in *Escobedo* and *Miranda.* It was no incommunicado interrogation of an individual in a police dominated atmosphere. After having volunteered the information that the woman he had shot might not be dead, he refused to give any additional information. His contention now that his conviction should be set aside because he was indigent and unrepresented by counsel must fall on deaf ears. Neither the law nor common sense permits or requires such a farcical result. *Cf. People v. Modesto,* 62 Cal. 2d 436, 398 P. 2d 753, 42 Cal. Rptr. 417 (1965); commented upon in K. Graham, "What is 'Custodial Interrogation?'" 14 U.C.L.A. Law Rev. 59, 118 (1966).

An officer does not question a misdemeanant at the risk of jeopardizing the prosecution of some felony he did not know

had been committed. Under the circumstances revealed by this record, we hold that the officer's questions were entirely proper and in nowise violated defendant's rights, either constitutional or statutory, and it was not error to admit for consideration by the jury the three statements which form the basis of defendant's fourth assignment of error. The first statement (that he had shot a woman) was a surprising and unexpected answer to a proper question. The second statement (that Hartley was a cop and it was for him to locate the victim) was badgering language and does not amount to a confession. The third statement (that the woman might not be dead and Hartley could be a hero) was *volunteered* and its admission into evidence is not barred under any theory of the law. *State v. Stepney,* 280 N.C. 306, 185 S.E. 2d 844 (1972). Defendant's fourth assignment of error is overruled.

Other assignments relating to motion for nonsuit and for directed verdict are formal requiring no discussion. For the reasons stated the verdict and judgment of the trial court must be upheld.

No error.

Justice HIGGINS dissenting.

Because of the suspicious behaviour of the accused, I am able to go along with the Court's holding that Officer Hartley had legal justification for searching the automobile, seizing the pistol, arresting the defendant for concealing it and thereafter, to continue the search which produced the paper money, the necklace-type watch, and the military dependent's identification card issued to Marilyn Best. Although not without some misgivings, I agree that the State was entitled to introduce these articles in evidence against the defendant in his murder trial.

Officer Hartley, alone in his officially marked automobile, was on highway patrol for the purpose of protecting persons and property. After midnight he saw a Thunderbird automobile parked adjacent to a mercantile building which was unlighted and apparently closed. As the officer entered the parking lot to investigate, he saw under the wheel a man apparently naked who, after seeing the officer enter, indicated an immediate desire to be elsewhere. The time, the place, and the behaviour

of the occupant were sufficient to satisfy an alert officer that the driver should be questioned and the legality of his presence and purpose ascertained. The act of hiding something justified the officer in finding out what object the driver desired to conceal from the law. I believe the arrest and the search were warranted. *State v. Hill,* 278 N.C. 365, 180 S.E. 2d 21; *State v. Jordan,* 277 N.C. 341, 177 S.E. 2d 289; *State v. McCloud,* 276 N.C. 518, 173 S.E. 2d 753; *Chambers v. Maroney,* 399 U.S. 42, 26 L.Ed. 2d 419.

The majority opinion now approves Judge Bailey's conclusions that the defendant's confession was admissible in evidence against him in his trial for murder in the first degree. Here are Judge Bailey's legal conclusions on the basis of which he ordered the confession admitted in evidence:

" . . . . Let the record further show that at the time the defendant was not suspected of any crime which would involve a penalty of over six months; that he was not required to waive his rights to an attorney or other constitutional rights in writing; and further there is no showing that the defendant was an indigent person at that time.

"Therefore, the OBJECTION IS OVERRULED. The officer will be permitted to state what the defendant said to him in response to that question."

Judge Bailey based his conclusions on two grounds: (1) The defendant was not entitled to counsel because he was being held on a petty misdemeanor charge for which the punishment could not exceed six months; and (2) A failure to show the defendant was an indigent person at the time of the hearing. No doubt defense counsel in making up the case on appeal included only so much of the evidence as had bearing on the validity of the legal conclusion the defendant was not entitled to counsel. Totally absent is any conclusion that the defendant waived any rights. The conclusion is that a waiver was not required.

The ruling was this: "The officer will be permitted to state what the defendant said to him *in response to that question.*" (Emphasis added.) There was discussion during the voir dire as to how much questioning by the officer brought forth the admission from the defendant that he had shot a woman on Fisher Road.

On the voir dire Officer Hartley testified after finding the pistol:

" . . . I asked Mr. Ratliff to take a' seat in the rear of my car and I got into the front seat and I asked him further if he had any identification and he stated he did not. I asked him his name and he stated his name was John Ratliff and I then informed him he was under arrest for carrying a concealed weapon and I read him his constitutional rights.

"I asked him if he understood them and he stated he did so."

Before the jury Officer Hartley testified:

"After I charged Mr. Ratliff with carrying a concealed weapon, I asked him where he had been and he said out off Fisher Road and I asked him where he shot out off Fisher Road and he said he had just shot a woman. Then I asked him who it was he shot . . . . I asked him what the location off Fisher Road this was where he had shot a woman."

The Court attempts to say the defendant's admission that he shot a woman on Fisher Road did not result from interrogation. However, the record discloses that Judge Bailey, at the conclusion of the voir dire, ruled the defendant's answer to Hartley's question was properly admissible and would be received in evidence. However, Judge Bailey was not willing to base his ruling solely on the ground that the defendant was not entitled to counsel, he being in custody on a petty charge, but added he was not entitled to counsel because he failed to show he was indigent. The officer's questions with reference to the shooting on Fisher Road and the defendant's answers thereto, had no bearing whatever on the charge of carrying a concealed pistol. The officer had seen the concealment. Obviously, by his questions, he was seeking information as to any illegal use which had been made of the pistol.

The defendant, after leaving Fisher Road, stopped in the parking lot. A search on the morning following his arrest disclosed two empty twenty-two cartridge cases at the spot where his automobile had been parked. These had been fired from the High Standard pistol the officer seized. By no means improbable was the defendant's feeling that Hartley's questions were based

on the officer's knowledge that a woman had been shot on Fisher Road. Both Hartley and the defendant knew the questions and answers involved something more than carrying a concealed pistol. As soon as the officer arrived at the sheriff's office after the arrest, Hartley requested the defendant to repeat what he had said about shooting a woman on Fisher Road. Hartley wanted another witness to the admission. This evidence was before Judge Bailey on the voir dire.

While the admissions may have been proper on a charge of carrying a concealed weapon, before they could be used as evidence on a charge of murder in the first degree, they had to qualify under G.S. 7A-457. This they could not do. Judge Bailey's petty misdemeanor test where no attorney is required, must fail. *State v. Lynch,* 279 N.C. 1, 181 S.E. 2d 561, required a written waiver. *State v. Wright,* 281 N.C. 38, 187 S.E. 2d 761, precluded any waiver either oral or written in a trial for murder in the first degree. The offense occurred and the admissions were made before the rewrite of G.S. 7A-457 by Chapter 1243, Session Laws of 1971.

The applicable law in effect at the appropriate time is here quoted:

"(a) An indigent person who has been informed of his rights under this subchapter may, *in writing,* waive any right granted by this subchapter, if the court finds of record that at the time of the waiver the indigent person acted with full awareness of his rights and of the consequences of a waiver. In making such a finding, the court shall consider, among other things, such matters as the person's age, education, familiarity with the English language, mental condition, and the complexity of the crime charged. *A waiver shall not be allowed in a capital case.*" (Emphasis added.)

Judge Bailey's conclusion a waiver was not required is not sustained.

Judge Bailey's second ground for admitting the confession (lack of indigency) also must fail. The defendant had been declared to be indigent and counsel had been appointed for him long before Judge Bailey's hearing. Judge Bailey heard no evidence, made no findings with respect to indigency, and while the question of indigency may be raised at any time,

when once established, however, the finding continues until evidence is heard and the finding made that indigency no longer exists.

The case on appeal recites: "ORDER DETERMINING INDIGENCY AND APPROVING ASSIGNMENT OF PUBLIC DEFENDER appears in the original transcript on file in the Office of the Clerk of the Supreme Court." This order bears the date of July 15, 1971.

The trial judge did not hear evidence and did not make any finding on the question of indigency. Until the trial judge conducted a further inquiry and found facts showing lack of indigency, he could not ignore the former adjudication. The record does not permit assumption that indigency no longer existed. True, under G.S. 7A-450(c), "The question of indigency may be determined or redetermined by the court at any stage of the action or proceeding at which an indigent is entitled to representation." This is so because an indigent may become solvent or a solvent person may become an indigent before the case is terminated. G.S. 7A-450(a) states: "An indigent person is a person who is financially unable to secure legal representation and to provide all other necessary expenses of representation in an action or proceeding enumerated in this subchapter."

"Sec. 7A-451(b) In each of the actions and proceedings enumerated in subsection (a) of this Section, entitlement to the services of counsel begins as soon as feasible after the indigent is taken into custody or service is made upon him of the charge, petition, notice or other initiating process. Entitlement continues through any critical stage of the action or proceeding, including, if applicable:

(1)   An in-custody interrogation;

(2)   A pre-trial identification procedure at which the presence of the indigent is required;

(3)   A hearing for the reduction of bail, or to fix bail if bail has been earlier denied;

(4)   A preliminary hearing;

(5)   Trial and sentencing; and

(6)   Direct review of any judgment or decree, including review by the United States Supreme Court of

State v. Ratliff

final judgments or decrees rendered by the high-
est court of North Carolina in which decision
may be had."

The foregoing requires counsel or a valid waiver through all
stages of the proceeding and it is presumed assigned counsel
will continue so long as the case is undecided by the courts.
*State v. Wright, supra.*

Judge Bailey did not find the defendant had waived coun-
sel. He found defendant was not entitled to counsel. This Court,
however, attempting to bolster Judge Bailey's conclusion, has
attempted to add a finding (not made by him) that the con-
fession was made voluntarily and not as a result of interroga-
tion. Questioning by officers arouses the suspicions if the
subject is under arrest or under any sort of official restraint.
"We have concluded that without proper safeguards the process
of in custody interrogation of persons suspected or accused of
crime contains inherently compelling pressures which work to
undermine the individual's will to resist and to compel him to
speak where he would not otherwise do so freely." *Miranda v.
Arizona,* 384 U.S. 436, 16 L.Ed. 2d 694, 719. As I read *Miranda,*
any sort of in-custody interrogation "contains inherently com-
pelling pressures." The result is any admissions made as a
result of in-custody questioning are inadmissible unless proper
safeguards are provided. Counsel must be provided or legally
waived. The Court's attempt to evade the rule by saying the
defendant was in custody only on a minor charge is certainly
not persuasive. If the Court is correct, the officers may arrest
for speeding, find money in the automobile, and ask questions
which result in the admission of a bank robbery. The con-
fession could be admitted in a charge of bank robbery because
it was obtained while the accused was under arrest only for a
petty misdemeanor. Surely the rule requiring counsel may not
be abrogated by a device quite so simple and transparent.

This Court has said: "Since defendant was then arrested
and in custody, the testimony as to what defendant said on
that occasion would be incompetent if defendant's statements
were made in response to interrogation by officers." *State v.
Jackson,* 280 N.C. 563, 187 S.E. 2d 27. " . . . (I)n-custody
statements attributed to a defendant, when offered by the
State and objected to by the defendant, are inadmissible *for
any* purpose unless, after a *voir dire* hearing in the absence

of the jury, the court, based upon sufficient evidence, makes factual findings that such statements were voluntarily and understandingly made by the defendant after he had been fully advised as to his constitutional rights." *State v. Catrett,* 276 N.C. 86, 171 S.E. 2d 398. For modification of the Catrett rule see *State v. Bryant,* 280 N.C. 551, 187 S.E. 2d 111; *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed. 2d 1. There is no presumption a confession is voluntary. *State v. McCloud, supra.*

This Court has made a frail attempt to say the defendant volunteered the confession and that it did not result from interrogation. What difference does it make if the confession results from a few or from many questions? The word interrogation comes to us from the Latin and is a combination of the prefix "inter" and the verb "rogare" which means to ask, to inquire, to question. Judge Bailey's reasons for admitting the defendant's confession made in response to Hartley's questions are not impressive. The Court's attempt to make them admissible as having been voluntary, does not appear to be an improvement. The Court seems to take the position the confession was not obtained by interrogation. The Court fails to advise how many questions and answers are required before the process amounts to interrogation.

What is said herein is not intended as any criticism of Officer Hartley's interrogation of the accused. In my opinion, Hartley acted properly in attempting to find out what, if any, illegal use had been made of the pistol. But the constitutional prohibition against self-incrimination and G.S. 7A-457 made the confession inadmissible for the purpose of making out the State's case in chief. The evidence, however, might very well be pertinent in rebuttal, if the case reaches the rebuttal stage. *State v. Bryant, supra; Harris v. New York, supra.* The officer could make use of the admissions in pursuing his investigation, but this use did not make them admissible in the trial.

In civil cases a trial judge is clothed with both legal and equitable powers. In criminal cases he may "temper the wind to the shorn lamb" or he may "add heat in proper degree." He sees, hears, and evaluates. On the other hand, the appellate court acts on a cold record which it must interpret according to fixed rules and standards. Penal statutes must be construed strictly in favor of the accused. *State v. Spencer,* 276 N.C.

535, 173 S.E. 2d 765; *State v. Ross,* 272 N.C. 67, 157 S.E. 2d 712. For stability, these rules and standards should remain constant. I complain that the Court's opinion in this case is trial court oriented.

A defendant, regardless of guilt, is entitled to require the State to make out its case by competent evidence. If this Court permits the guilty to be convicted on incompetent evidence, the innocent will soon fall victim to the rule.

I vote to award the defendant a new trial on the ground his confession was erroneously admitted over his objection.