STATE OF NORTH CAROLINA v. ROY ARTHUR HADDOCK

No. 101

(Filed 31 July 1972)

1. **Criminal Law § 75— voluntariness of in-custody statement**

Where defendant was twice advised of his constitutional rights, stated each time that he knew his rights and fully understood them, then freely, knowingly and understandingly signed a written waiver of his right to the presence of counsel, the requirements of *Miranda* were fully met, and defendant's statement was competent as far as federal constitutional standards are concerned.

2. **Constitutional Law § 32— right to counsel — indigent defendant — in-custody interrogation — waiver of counsel**

Where an indigent defendant charged with a capital offense makes a statement competent under *Miranda,* the statement may still be rendered incompetent by reason of G.S. 7A-457(a) which provides that a waiver of counsel shall not be allowed in a capital case; but it is only in those instances where defendant's statement is the result of a custodial interrogation that such statement is incompetent.

3. **Criminal Law § 75— in-custody statement — waiver of counsel — indigent defendant charged with capital offense**

An indigent defendant's statement with respect to his commission of a capital crime was admissible, though made without benefit of counsel, because the statement was not the result of an in-custody interrogation, but was defendant's own voluntary narration.

4. **Constitutional Law § 32— right to counsel — indigent defendant — in-custody interrogation — waiver of counsel**

Under former G.S. 7A-457(a), an indigent defendant in a capital case could not waive the right to counsel either orally or in writing; however, the statute so providing had no application to volunteered statements.

5. **Criminal Law § 75— voluntary statements — admissibility**

Volunteered statements are competent evidence, and their admission is not barred under any theory of the law, state or federal.

6. **Criminal Law § 75— in-custody statement — questioning by officers**

A voluntary in-custody statement does not become the product of an "in-custody interrogation" simply because an officer, in the

State v. Haddock

course of defendant's narration, asks defendant to explain or clarify something he has already said voluntarily.

Chief Justice BOBBITT concurring in result.

Justices HIGGINS and SHARP join in concurring opinion.

APPEAL by defendant from *Seay, J.,* 23 August 1971 Criminal Session, GUILFORD Superior Court.

Defendant was tried upon a bill of indictment charging him with the murder of Robert Earl DeShazo in Guilford County on 19 April 1971.

The State's evidence tends to show that about 3 a.m. on 19 April 1971 Robert Earl DeShazo, an attendant at a Kayo Service Station near Greensboro, North Carolina, was shot and killed. His body was found on the service station driveway. Near his right hand was a .32 caliber snub-nosed revolver containing two spent cartridges and five live rounds in the chamber.

Policeman R. L. Grogan had stopped defendant earlier that night, before the murder, and given him a traffic ticket. At that time defendant was driving a light-colored Plymouth bearing North Carolina License No. FR-9702. Between 2:00 and 2:30 a.m. two men in a white Plymouth drove into the Gate Service Station located one-half mile from the Kayo Service Station where DeShazo was killed, and asked for a Coke. The attendant was suspicious and told the men to get the Cokes themselves, whereupon they drove rapidly away. The attendant noted the license number of the vehicle was FR-9702. A short time later he saw the car heading in the direction of the Kayo Service Station.

Eugene Porterfield operates a cafe on Highway 49 near Roxboro and during the day of 19 April 1971 observed a light-colored 1967 Plymouth parked near his place of business. Its left front window was shot out and there was blood on the front seat of the car. Porterfield notified the highway patrol, and Patrolman A. J. Johnson investigated. He found the left front window of the car broken out and scattered pieces of glass in the car. He noticed bloodstains on the driver's seat. He discovered on the front seat, in plain view, the traffic citation which had been issued to the defendant by Policeman Grogan on the 18th of April. This citation was offered in evidence as State's Exhibit No. 6.

Doctor S. V. Hulbanni testified that on the 19th of April he removed a bullet from the left arm of the defendant in the Norfolk General Hospital in Norfolk, Virginia. There was no infection, indicating the defendant's wound was fresh.

As a result of information received, SBI Agent Henry Poole went to Danville, Virginia, with Deputy Sheriff Worrell. There they obtained a fugitive warrant for defendant's arrest. The officers then proceeded to the Danville bus station where they met Bus No. 3114 upon its arrival. They boarded the bus and found the defendant asleep. He was placed under arrest by Sergeant Wyatt of the Danville Police Department and fully advised of his constitutional rights by SBI Agent Poole. Defendant was then taken to the Danville Police Station. Upon entering an office which had been furnished to Agent Poole, the defendant indicated he wanted to make a statement. Mr. Poole advised the defendant to wait but defendant spoke anyway and said he was coming to turn himself in. At that point Mr. Poole again advised defendant of his constitutional rights. Defendant indicated he understood those rights and signed a written "Waiver of Rights." He then reiterated that he was coming to turn himself in and said, "The hardest thing I ever did was to pull that trigger." Officer Poole asked him to explain that statement and he said: "I pulled in the service station to rob the man. He had his hand in his pocket. I told him to take his hand out of his pocket. When he did, he had a gun in it." Defendant then stated that the man shot him in the arm and that he shot the man; that he got back into his car and the man shot a second time, shooting out the glass in the car. Defendant said he then "sort of laid down" in the front seat of the car and drove away as quickly as he could.

Defendant further related to Officer Poole that prior to the shooting incident he had been to the Kayo Station and had pulled into a Gate Service Station and asked for directions; that he had been engaged in a fight with some Negroes and had gone to Burlington where he obtained his shotgun; that he purchased two dollars' worth of gas at the Kayo Station on his return trip to Greensboro; that after purchasing the gas he went to look for the Negroes but was unable to find them and decided to return to the Kayo Station to rob the man.

Defendant further stated that he had been to a doctor in Norfolk, Virginia, who removed a bullet from his arm. Defendant

thereupon took a bullet from his wallet, identifying it as the one removed from his arm by the doctor, and gave it to the officer. He told the officer that he had thrown the shotgun with which he shot DeShazo into a creek near Greenville and gave minute directions leading to a bridge on a dirt road from which he had thrown the weapon. Those directions were followed and the weapon was recovered from the creek. This weapon, a sawed-off shotgun, was offered in evidence over defendant's objection.

E. B. Pearce, a specialist in firearms identification with the State Bureau of Investigation, testified that he compared the bullet removed from defendant's arm with a bullet he test fired from the .32 caliber pistol found on the service station driveway near the right hand of Robert Earl DeShazo, the deceased, and found many identical characteristics; that in his opinion the bullet taken from defendant's arm was fired from State's Exhibit 5, the .32 caliber revolver. The bullet was offered in evidence over defendant's objection.

Upon defendant's timely objection the jury was excused and a voir dire conducted with respect to the foregoing inculpatory statements made to SBI Agent Poole and other officers. Both the State and the defendant offered evidence on the voir dire, at the conclusion of which the court made findings of fact and concluded that defendant's statement to the officers "was made freely, voluntarily and understandingly, after the defendant had been warned as per the *Miranda* decision and his constitutional rights explained to him." Defendant's motion to suppress the evidence was denied; and the bullet taken from his arm, the shotgun recovered from the creek, and defendant's statement to Officer Poole were admitted in evidence before the jury over defendant's objection.

Defendant offered no evidence before the jury. The jury convicted him of murder in the first degree and recommended life imprisonment. Judgment was pronounced accordingly, and the defendant appealed to the Supreme Court assigning errors noted in the opinion.

*Wallace C. Harrelson, Public Defender, and Dale Shepherd, Assistant Public Defender, for the defendant appellant.*

*Robert Morgan, Attorney General, and Roy A. Giles, Jr., Assistant Attorney General, for the State of North Carolina.*

HUSKINS, Justice:

Defendant assigns as error the admission of his inculpatory statements to SBI Agent Poole, made while in custody and without benefit of counsel. He contends the incriminating statements are tainted and inadmissible because he was indigent at the time, charged with a capital offense, and incapable of waiving his right to counsel by the express language of G. S. 7A-457(a). He relies on that statute and on *State v. Lynch,* 279 N.C. 1, 181 S.E. 2d 561 (1971), and *State v. Bass,* 280 N.C. 435, 186 S.E. 2d 384 (1972), in support of his position.

[1, 2] The record discloses that defendant was twice advised of his constitutional rights as required by *Miranda v. Arizona,* 384 U.S. 436, 16 L.Ed. 2d 694, 86 S.Ct. 1602 (1966). Each time defendant said he knew his rights and fully understood them. He then freely, knowingly and understandingly signed a written waiver of his constitutional right to the presence of counsel. Thus the requirements spelled out in *Miranda* were fully met, and defendant's entire statement was competent insofar as federal constitutional standards are concerned. *Miranda v. Arizona,* supra. If defendant's statement, or any part of it, was incompetent, its incompetency arises solely by reason of G.S. 7A-457(a) (1969) which at that time provided, *inter alia:* "A waiver shall not be allowed in a capital case." The State contends defendant's statement was volunteered and not the result of a custodial interrogation. This requires a review of the setting and the circumstances under which defendant's incriminating statement was made.

The record reveals that upon his arrival at the Danville Police Station defendant had indicated he wanted to make a statement. He had already been given the *Miranda* warning when he was removed from the bus. Officer Poole "asked him to wait just a moment" and again advised him of his rights as follows:

> "Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questions, if you wish. If you decide to

answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer."

Officer Poole thereupon handed defendant the paper from which the *Miranda* warnings had been read. Defendant read the warnings himself and stated that he understood his rights. The paperwriting contained a Waiver of Rights at the bottom of the page in the following language:

"I have read this statement of my rights, and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me, and no pressure or coercion of any kind has been used against me."

Defendant then signed the waiver. Then, without any questions on the part of the officers, defendant reiterated his earlier statement that he was coming to turn himself in and added, "The hardest thing I ever did was to pull that trigger." When Officer Poole asked him to explain that statement defendant said: "I pulled in the service station to rob the man. He had his hand in his pocket. I told him to take his hand out of his pocket. When he did, he had a gun in it." He said the man shot him in the arm and he then shot the man after which he got back into his car and the man shot a second time, shooting out the glass in the car. Defendant then said he "sort of laid down in the front seat of the car and drove away as quickly as he could." He said that prior to this incident he had been to the Kayo Station once before that morning, awakened the attendant, purchased two dollars' worth of gas, and departed. He said there was another party with him at that time and that earlier that night they had had a fight with some Negro males as a result of which he had gone to Burlington and obtained his shotgun and returned to Greensboro; that after purchasing the gas he went looking for the Negro males, couldn't find them, and returned to the Kayo Station to rob the man.

Defendant further stated that he had been to a doctor in Norfolk, Virginia, and had a bullet removed from his arm. Officer Poole asked him if he had the bullet and defendant took it from his wallet and handed it to the officer. Officer Poole asked defendant where the shotgun was and defendant

stated he had thrown it in a creek near Greenville. Officer Poole asked him where this creek was located and defendant stated that "as you go out of Greenville on Highway 264, you take the right road toward the Bel Arthur section. That, after you take the right-hand road to the Bel Arthur section, you would turn left on the first dirt road; that approximately a quarter of a mile down this dirt road there was a bridge; that he threw this weapon off the left-hand side of the bridge." These directions were later followed and the weapon was found at that exact spot in the creek.

Is the foregoing narration of events the result of "custodial interrogation" and its admissibility prohibited by G.S. 7A-457 (a) due to absence of counsel? We think not.

[3]  The United States Supreme Court said in *Miranda v. Arizona, supra:* "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. . . . Any statement given freely and voluntarily without any compelling influence is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." Thus, assuming defendant's indigency, the presence of counsel was not required because defendant's statement at the police station in Danville was not the result of an in-custody interrogation initiated by the officers. Rather, it was defendant's own voluntary narration, freely and understandingly related. It is perfectly apparent that from the moment defendant was removed from the bus he was anxious to talk and that his entire narration of events is properly classified as a volunteered statement. In fact, the officers would not allow him to talk until he had twice been advised of his constitutional rights and had freely, knowingly and understandingly waived those rights, including the right to counsel, *in writing.* Defendant's volunteered confession would have been admissible by constitutional standards even in the absence of warning or waiver of his rights. By the same token they were admissible in the trial of this case notwithstanding the provision in G.S. 7A-457 (a) (1969) that "[a] waiver shall not be allowed in a capital case."

No waiver is involved with respect to volunteered statements, and the quoted language defendant relies on has no application to the factual situation depicted by the setting and circumstances under which defendant's incriminating statement was made. Officers are not required to gag the guilty who want to confess.

*State v. Lynch, supra,* was not a capital case and is not authority for defendant's position here. In *Lynch* defendant was fully advised of his constitutional rights, stated he did not want a lawyer, but did not sign a *written* waiver as then required by G.S. 7A-457(a) (1969). Even so, it was held that Lynch's voluntary narrative statement was not the result of an *in-custody interrogation* and was therefore admissible in evidence even though the statement was given in the absence of counsel. Only certain tape recorded statements in response to in-custody interrogation by the officers were held inadmissible because defendant's waiver of counsel was not in writing. Thus *Lynch,* in these respects, supports our conclusion that defendant's narration of events which occurred the night DeShazo was killed is properly classified as a volunteered statement.

[4] We said in *State v. Bass,* 280 N.C. 435, 186 S.E. 2d 384 (1972) : "At all times pertinent to this case, an indigent defendant in a capital case could not waive the right to counsel either orally or in writing," citing G.S. 7A-457 and *State v. Lynch, supra.* The quotation has no application to volunteered statements.

[5, 6] Volunteered statements are competent evidence, and their admission is not barred under any theory of the law, state or federal. *State v. Stepney,* 280 N.C. 306, 185 S.E. 2d 844 (1972) ; *State v. Ratliff,* 281 N.C. 397, 189 S.E. 2d 179 (1972) ; *State v. Chance,* 279 N.C. 643, 185 S.E. 2d 227 (1971) ; *Miranda v. Arizona, supra.* And a voluntary in-custody statement does not become the product of an "in-custody interrogation" simply because an officer, in the course of defendant's narration, asks defendant to explain or clarify something he has already said voluntarily.

We hold that defendant's statement to the officers was truly the product of free choice, entirely devoid of physical or mental intimidation, and without the slightest compulsion of in-custody interrogation procedures. The sturdy pillar of Fifth Amendment rights against self-incrimination so forcefully up-

held in *Miranda* would be subverted by a contrary view. Defendant spoke in the unfettered exercise of his own will, and his statements may not now be distorted into something they never were.

The constitutionality of the no-waiver sentence in G.S. 7A-457 was not raised in *Lynch, Bass, Chance,* or in this case. It should be noted, however, that the sentence in that statute which forbids an indigent to waive counsel in a capital case was held unconstitutional in *State v. Mems,* 281 N.C. 658, 190 S.E. 2d 164 (filed 31 July 1972).

Defendant's first assignment of error is overruled.

Other assignments relating to admissibility of the bullet, the sawed-off shotgun defendant used to kill DeShazo, and defendant's statements concerning them, lose their vitality in light of our holding that defendant's narration of events on the night of the murder was volunteered and not the result of questioning initiated by the officers.

Evidence of defendant's guilt is overwhelming. His conviction results from a trial free from prejudicial error. The verdict and judgment of the trial court must therefore be upheld.

No error.

Chief Justice BOBBITT concurring in result.

I concur in the result on these grounds: (1) Defendant's statements to Officer Poole were made voluntarily and were not the product of an "in-custody interrogation." (2) By its decision in *Furman v. Georgia,* 408 U.S. 238, 33 L.Ed. 2d 346, 92 S.Ct. 2726, decided June 29, 1972, the Supreme Court of the United States, holding that punishment by death is not permissible under statutory provisions such as those incorporated in present North Carolina statutes, has invalidated and rendered obsolete that portion of G.S. 7A-457(a) which relates solely to a "capital case."

As stated in my concurring *in result* opinion in *State v. Mems, ante* 674, 190 S.E. 2d 174, I do not share the view that the State's counsel have standing to challenge the constitutionality of G.S. 7A-457(a). Surely, the General Assembly

has greater authority to declare and determine the State's policy and position than the State's prosecuting attorneys.

Justices HIGGINS and SHARP join in this concurring in result opinion.