James O. MITCHELL, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 22052.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 22, 1969.

Decided May 13, 1970.

Certiorari Denied Oct. 19, 1970.
See 91 S.Ct. 109.

Mr. Sol Rosen, Washington, D. C., for appellant.

Mr. Philip L. Kellogg, Asst. U. S. Atty., with whom Mr. David G. Bress, U. S. Atty., at the time the brief was filed, was on the brief, for appellee. Messrs. Thomas A. Flannery, U. S. Atty., and John A. Terry, Asst. U. S. Atty., also entered appearances for appellee.

Before WILBUR K. MILLER, Senior Circuit Judge; and WRIGHT and MacKINNON, Circuit Judges.

MacKINNON, Circuit Judge:

Appellant was indicted for second degree murder (D.C.Code § 22–2403) and carrying a dangerous weapon (D.C.Code § 22–3204). The jury returned a verdict of guilty as charged and appellant was sentenced to imprisonment for five to twenty years on the second degree murder count and one year on the dangerous weapon count, the two sentences to run concurrently.

The evidence may be briefly summarized. Mrs. Bessie Redd, the only eyewitness to the shooting present at the trial,[1] testified that she heard "words pass" between the deceased, Edward Shoffner, and the appellant; as she turned to face the two, she saw "two shots hit the cement floor," she being so close that "the fire from the bullet * * * grazed my scalp. * * *"; the deceased then walked a few steps and fell, and that the appellant had a gun in his hand at this time.

The Deputy Coroner for the District of Columbia testified that the decedent's autopsy revealed the cause of death to be a bullet which entered the *back* of the head. He stated that the trajectory of the bullet would have been horizontal had the decedent been standing at the time the shot was fired.

Detective Samen testified that when he arrived at the scene of the shooting, he found the body of decedent between the living room and the kitchen of the apartment. He testified that he did not suspect appellant at this point; only talked to him as a witness; that appellant told him he had been standing in front of the premises when he thought he heard a gunshot and had only then gone inside; and that appellant was then taken to the Homicide Squad Office in order to give a witness statement.

Detective Boyd corroborated Detective Samen's testimony; testifying that he had gone to the scene of the shooting; had returned to the Homicide Squad Office with Detective Samen and appellant; and that he then began to type out a witness statement from the appellant. Appellant started his statement as a witness by repeating to Detective Boyd that he had gone inside the premises only after he heard the shots; that he noted Shoffner lying on the floor and "I couldn't get an ambulance so I called the police."

At about this point in the process of taking the statement Detective Samen was informed of an anonymous phone call implicating appellant as the one who had done the shooting. He stated that he then went to where the appellant was giving his witness statement to Detective Boyd, placed him under arrest, and gave him the *Miranda* warnings as follows:

You are under arrest. Before we ask you any questions, you must understand what your rights are.

You have the right to remain silent. You are not required to say anything to us at any time or to answer any questions.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we question you and to have him with you during questioning.

If you cannot afford a lawyer and want one, a lawyer will be provided for you.

1. The shooting occurred at 1334 Corcoran Street, N. W. in Washington, D. C. Several persons were present at the time of the shooting, but Mrs. Redd was the only one called to testify.

If you want to answer questions now without a lawyer present, you will still have the right to stop answering at any time until you talk to a lawyer.

Detective Samen further testified that the appellant then told him that "he [the appellant] had this gun, it belonged to a person by the name of Hattie, and it was an automatic, and he was trying to unload it, and the gun went off twice and struck the decedent." Detective Samen further testified that shortly after he made this statement the appellant called an attorney, and the interview was then terminated. Detective Boyd also corroborated Detective Samen's testimony in these particulars.[2]

The appellant took the stand and testified that he had known the deceased well; that he had taken a gun from the deceased the night before the slaying in order to prevent him from getting into trouble, and had put this gun in a closet in the apartment where the deceased was living and where appellant kept his tools. Appellant further testified that on the day in question he had come to the apartment in order to get his tools, as he was bending over to get the tools out of the closet he asked decedent why he had robbed a certain individual, that deceased apparently became angered at this question and that "he walked over, stood up over me. I was bent down in the closet. So I straightened up, I raised up in the closet, turned around and fired a shot in the floor. And when I fired the shot in the floor, he shoved me and as I fell back, the gun went off again. * * *" Appellant said he fired the first shot into the floor only to scare the deceased, and that he had no intention of shooting him.

On cross-examination, the Government confronted appellant with his previous inconsistent statements that (1) he was standing outside the building, heard a shot and then went inside, and (2) that the gun had gone off accidentally while he was trying to unload it. Appellant admitted both of these prior statements but denied that the police had notified him of his arrest or of his *Miranda* rights. However, there are four features of the written statement Detective Boyd was typing out that corroborate the police testimony. First, the statement does not include any statement made by Mitchell after the police heard that he had done the shooting.[3] Secondly, it does not include any of the statements that Detective Boyd testified appellant made after he was warned of his rights. From a prosecution stand-

---

2. Detective Boyd's actual testimony follows:

Q Now, at that particular point, after Sergeant Samen told you that he was under arrest and read the warning to him, did he make any statements to you?

A Yes.

Q Did he say whether or not he wanted a lawyer at that particular time?

A No, sir. He just said, "You want me to tell you what happened?" And then he told us briefly that he had taken the gun away from the decedent, he stated it was an accident, that the gun went off twice. And I asked him where he was in the room at the time, and he said he was standing up. I asked where the decedent was, and he said he was standing up. I asked what the decedent was doing, and he said that he was talking to him.

I said, "How did you get the gun away from him?"

He said, "I asked him for it, he hemmed and hawed."

I asked him how do you get it open. He said he was trying to get the magazine open.

I asked what kind of gun it was. He said a .38 automatic.

I asked him what he had done with the gun after the shooting. He said he threw it into a drum at the rear of the house.

Q Now, did there come a time when he subsequently asked for a lawyer? Do you recall him asking for a lawyer at any time then?

A I remember Samen made a call to a lawyer. I don't remember at this time whether he asked, my notes don't reflect it. I don't remember.

3. The written statement was not admitted into evidence.

point it would have been desirable to also include these statements in any written statement. Thirdly, the typewritten statement was unsigned and appellant never claimed that he had been asked to sign it. Obviously, the police would have preferred a signed statement. Fourth, the elapsed times testified to are about sufficient to allow the various parties to do what the testimony indicates they did do.

On this appeal, the appellant argues that the trial court erred (1) in admitting his prior inconsistent statement, (2) in its instructions on malice and "excusable homicide," and (3) in submitting the case to the jury on second degree murder.

## I

The appellant first challenges the introduction into evidence of his prior inconsistent statement.[4] Originally he made a pretrial motion to suppress this statement on the grounds that he had not been warned of his rights as required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). At the hearing on this motion, the trial court resolved a conflict in the testimony against the appellant and ruled that the statement would be admissible. On this appeal, the appellant again argues that he was not warned of his rights and, in addition, contends that in any event he did not waive his rights prior to making the statement in question. As to the argument that appellant was not warned of his rights, we find substantial evidence to support the trial court's decision of this factual question. The question of whether appellant *waived* his rights under *Miranda* requires some additional amplification.

The *Miranda* Court addressed itself to the question of waiver as follows (384 U.S. at 475, 86 S.Ct. at 1628):

> If the interrogation continues without the presence of an attorney and a

statement is taken,[5] a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. Escobedo v. Illinois, 378 U.S. 478, 490, n. 14, 84 S.Ct. 1758, 1764, 12 L.Ed.2d 977. This Court has always set high standards of proof for the waiver of constitutional rights, Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct 1019, 82 L.Ed. 1461 (1938), and we re-assert these standards as applied to in-custody interrogation. (Footnote citation added).

The high standard of proof of constitutional rights adopted in Johnson v. Zerbst and re-asserted in *Miranda* was stated in *Johnson* to be as follows (304 U.S. at 464, 58 S.Ct. at 1023):

> It has been pointed out that "courts indulge every reasonable presumption against waiver" of fundamental constitutional rights and that we "do not presume acquiescence in the loss of fundamental rights." A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.

With these standards in mind, we turn to the facts of the instant case. Although appellant indicated immediately after the *Miranda* warnings were given that he wanted to tell his story to the police, we note that there is no direct evidence that appellant *expressly* waived his rights, and we are therefore relegated to the question of whether appellant's "background, experience, and conduct," when taken together with the statement of his *Miranda* rights that was

---

4. The appellant is not objecting to the introduction of his first inconsistent statement made as a witness—that he went into the premises only after he heard the shots.

5. The officer ceased typing the written statement the moment appellant was placed under arrest, and no attempt was made to have Mitchell adopt the statement to the extent it had been prepared.

read by Detective Samen, are sufficient to show a knowing and intelligent waiver of his rights.

Although the alleged absence of a waiver was not urged by appellant's counsel at the motion to suppress, the trial court ruled on the question of whether appellant had been given the *Miranda* warnings in the following language:

> * * * [I] think the weight of the evidence is clearly to the effect that he was warned of his rights, he understood his rights, he, himself, said he had been in trouble before, he knows all about his rights to have lawyers, and so on. * * * He continued voluntarily to talk to the officers. Then he decided that perhaps he'd better get a lawyer. And as soon as he talked to his lawyer, they stopped questioning him.

The transcript of the hearing on the motion to suppress shows that appellant testified that he had been in trouble before and had prior occasion to consult with lawyers. Moreover, appellant testified at the suppression hearing that he was aware of his right to a lawyer at the time he made the statement in question.[6] In fact, he stated that Detective Samen assisted him in getting the number of his lawyer, whom he called shortly after making the statement in question. The interrogation was terminated after appellant had spoken with his attorney.

■ In this context, we note that Detective Boyd testified that the appellant, upon being arrested and informed of his rights, immediately stated, "You want me to tell you what happened?" The appellant then proceeded to make the statement that the gun had discharged accidentally while he was trying to unload it. This chain of events indicates that appellant's statement was made spontaneously in respose to being informed of his arrest. Thus, giving due regard to the opportunity of the trial court to judge the credibility of the witnesses, as we are required to do on this appeal, we conclude: (1) that appellant was warned of his rights, (2) that appellant understood his rights, (3) that appellant was not denied the right to counsel, (4) that there was no police overreaching, and (5) that appellant voluntarily intended to make the statement in question. In these circumstances, it is difficult to reach any conclusion except that appellant knowingly and intentionally waived his rights. *See* Pettyjohn v. United States, 136 U.S. App.D.C. 69, 71–73, 419 F.2d 651, 653–655 (1969), cert. denied, 397 U.S. 1058, 90 S.Ct. 1383, 25 L.Ed.2d 679 (1970).

■ We recognize that *Miranda* prohibits the inference that a waiver was made simply from the fact that a confession was eventually obtained. Miranda v. Arizona, *supra*, 384 U.S. at 475, 86 S.Ct 1602. *See also* Carnley v. Cochran, 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed. 2d 70 (1962). Indeed, when the only evidence is that at the start of the interrogation the warnings were given, and at the conclusion of the interrogation a confession had been obtained, courts would do well to require clear evidence of the vital connecting link, *i. e.*, did the interrogated person in fact waive his rights? *See* Proctor v. United States, 131 U.S.App.D.C. 241, 243–244, 404 F.2d 819, 821–822 (1968). In the absence of this evidence, *Miranda* is clear that a waiver has not been proven. But to assign probative value on the question of waiver to the fact that appellant made the statement in question immediately upon being informed of his arrest at a time *when he was well aware of his right not to speak* is not to draw the prohibited inference. That appellant did speak when he knew he was not required to do so, in these circumstances, is a factor to be considered in passing on the

---

6. Appellant testified:

> Q You knew at that time you had a right to have a lawyer, didn't you?
> A Well, I knew I had a right to have a lawyer, the reason why I asked him couldn't I call a lawyer. He said yes.
> Q They never denied you a right to have a lawyer, did they?
> A Never have. Never did.

ultimate question of waiver. And when we view this evidence in conjunction with appellant's background and experience, we conclude that the Government has sustained its burden of proving a knowing and intelligent waiver.

In Frazier v. United States, 136 U.S. App.D.C. 180, 419 F.2d 1161 (1969), the appellant, after expressly waiving his rights, confessed to several crimes. However, shortly after starting his confession, he requested the interrogator not to write anything down. The court concluded that this request "inveighed against intelligent waiver," and remanded the case to the District Court for a determination of the question. In the instant case, however, there is no evidence that appellant was confused as to the consequences of his waiver or otherwise failed to understand his rights. In fact, his call to his attorney immediately after he finished his statement corroborates the conclusion that he did understand his rights, and the trial court has already ruled that he voluntarily and intelligently waived such rights.

## II

■■ Appellant next argues that the trial court committed plain error[7] in its instructions on the definition of malice by charging by way of conclusion to its malice instruction: "In determining whether a wrongful act is intentionally done and, *therefore, done with malice aforethought,* you should again bear in mind that every man is presumed to intend the natural and probable consequences of his own acts." (Emphasis added.) This court struck down a virtually identical instruction in Green v. United States, 132 U.S.App.D.C. 98, 100, 405 F.2d 1368, 1370 (1968) (*Green I*), on the grounds that such a definition of malice improperly eliminated the elements of willfulness or want of justifica-

tion for the wrongful act. As in the instant case, the trial court in *Green I* had previously instructed that such elements were a part of the legal definition of malice, and the incorrect definition was added only by way of summation. Nevertheless, the *Green I* court felt obliged to reverse since this error had occurred in conjunction with another instructional error on malice,[8] and the court was of the opinion that the cumulative effect of the two errors may well have prejudiced the appellant. *See also* United States v. Wharton, —— U.S.App. D.C. 139, 433 F.2d 451 (decided January 5, 1970). However, in the instant case, the remainder of the court's instructions were proper. In these circumstances, we are of the opinion that the recent decision of United States v. Green, 137 U.S.App.D.C. 424, 424 F.2d 912 (decided February 19, 1970) (*Green II*) is applicable. When the *Green I* case was reversed, the appellant was given a new trial and the court again committed substantially the same error in its malice instruction. Upon his re-conviction, the appellant again appealed, but this time the *Green II* court affirmed his conviction, and distinguished *Green I* on the grounds that in the first case there were two erroneous malice instructions, whereas in *Green II* the error stood alone and did not constitute plain error. In the instant case, the cumulative effect of two erroneous malice instructions is absent, and we conclude that the single erroneous instruction, coming shortly after a full and proper instruction on malice, does not constitute plain error. *Cf.* Belton v. United States, 127 U.S.App.D.C. 201, 382 F.2d 150 (1967); Howard v. United States, 128 U.S.App.D.C. 336, 389 F.2d 287 (1967).

■ The appellant also argues that the trial court erred in its instructions to the jury on "excusable homicide" or

---

7. *See* Fed.R.Crim.P. 52(b).

8. The trial court in *Green I* had instructed that the law *presumed* malice from the use of a deadly weapon in the commission of the homicide. The correct rule, of course, is that the law merely permits such an inference to be drawn, but does not require it. Green v. United States, 132 U.S.App.D.C. 98, 99, 405 F.2d 1368, 1369 (1968).

homicide by misadventure. We quote the challenged instruction:

> If he was carrying that dangerous weapon in violation of the statute, then the defense of accidental death is not available to him since it is essential to the defense of accidental death that the defendant be engaged at the time in a lawful act by lawful means.

The appellant contends that the court erroneously adopted a *per se* rule that one engaged in unlawful conduct may not rely on the defense of accidental death; he argues that a proper instruction must be based on the violation of a duty owed another (*i. e.*, negligence) rather than such a *per se* rule. However, no objection was made to the instruction at trial and we do not reach this issue on this appeal. There may well be cases involving alleged accidental death from carrying dangerous weapons in violation of statute where this instruction would not be proper. *Cf.* United States v. Pardee, 368 F.2d 368 (4th Cir. 1966).

■ We note in passing that the trial court properly instructed on the degree of recklessness required to convict of second degree murder or manslaughter, and thus there is no room for the contention that, in limiting the defense of accidental death, the court required the jury to find appellant guilty of one of these offenses.[9]

### III

■ Finally, appellant argues that the evidence in this case is insufficient to uphold a second degree murder conviction. In passing on this contention, it is useful to note that the trial court instructed the jury on malice as follows:

> Malice may be either express or implied. Express malice exists when one unlawfully kills another in pursuance of a wrongful or unlawful purpose without legal excuse. Implied malice is such as may be inferred from the circumstances of the killing, as, for example, where the killing is caused by the intentional use of fatal force without circumstances serving to mitigate or justify that force, or when an act which imports danger to another is done so recklessly or wantonly as to manifest depravity of mind and disregard of human life.

As to evidence under the *express* malice standard, the Deputy Coroner testified that, assuming the deceased was standing at the time the fatal shot was fired, the bullet entered the back of his head on a horizontal trajectory. When this evidence is viewed in conjunction with Mrs. Redd's testimony that the "fire from the bullet" grazed her scalp, we think the jury had a sufficient basis to find that appellant intentionally and maliciously[10] shot the deceased in the back of the head.

When all the evidence is considered it is not surprising that the jury chose to disbelieve Mitchell's story that the killing was accidental, because the autopsy testimony showed that the bullet that killed had entered the *back* of Shoffner's head on a horizontal trajectory to the floor.

■ If, however, the jury found *implied* malice, the validity of the verdict is even clearer. The appellant himself testified that he intentionally fired the gun at the floor in a room where several persons were present. The jury could have concluded from this testimony that appellant acted "so recklessly or wantonly as to manifest depravity of mind and disregard of human life." It was proper to instruct that malice to support a second

---

9. The court properly instructed that malice to support a second degree murder conviction may be implied from conduct which is "done so recklessly or wantonly as to manifest depravity of mind and disregard of human life." As to manslaughter, the court instructed that a conviction must be based upon conduct which involves "unreasonable risk of death or grave bodily harm" or is "reckless."

Here, in returning the second degree murder verdict the jury necessarily found malice.

10. The jury was instructed that it may infer malice from the use of a deadly weapon in the commission of the homicide, but that it was not required to do so. This instruction was proper. *See* note 8 *supra.*

degree murder conviction may be implied from wantonly reckless conduct, and we decide there was sufficient evidence in this case for the jury to so infer. *See* United States v. Dixon, 135 U.S.App.D.C. 401, 419 F.2d 288 (1969) (Leventhal, J., concurring) ; Austin v. United States, 127 U.S.App.D.C. 180, 184, 382 F.2d 129, 133 (1967) ; Lee v. United States, 72 App.D.C. 147, 150–151, 112 F.2d 46, 49–50 (1940).

The judgment is
Affirmed.