STATE OF NORTH CAROLINA v. JOHNNY JAMES BLACKMON

No. 2

(Filed 10 October 1973)

1. **Constitutional law § 32; Criminal Law § 75— right to counsel— acts constituting waiver**

    Where defendant was given the Miranda warnings, never requested the presence of counsel but never said he did not want a lawyer, and subsequently made a voluntary statement, defendant did not waive his right to counsel, since failure to request counsel does not constitute a waiver; rather, the record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer.

2. **Criminal Law § 75— defendant in custody — voluntary statements — admissibility**

    Where defendant while in custody made a spontaneous and voluntary response to a co-defendant's statement and further narrated events surrounding the homicide in question in response to a neutral question asked by the sheriff, defendant spoke in the voluntary exercise of his own will and without the slightest compulsion of in-custody interrogation procedures; therefore, defendant's statements were properly admitted into evidence as volunteered statements made under circumstances requiring neither warnings nor the presence of counsel.

3. **Constitutional Law § 35; Criminal Law § 135— homicide — mandatory death sentence inapplicable**

    Sentence of death given defendant for a homicide committed on 5 January 1971 cannot stand, since the mandatory death penalty for capital offenses may not be constitutionally applied to any offense committed prior to 18 January 1973, the date that *State v. Waddell* was filed.

    Justice HIGGINS concurs in result.

    Chief Justice BOBBITT and Justice MOORE dissent.

APPEAL by defendant from judgment of *Ervin, J.*, 28 August 1972 Session, UNION Superior Court.

Defendant is charged in a bill of indictment, proper in form, with the first degree murder of James Alexander Howell on 5 January 1971. He was first tried at the 29 March 1971 Session of Stanly Superior Court, convicted by the jury, and sentenced to death. He appealed to the Supreme Court and we awarded a new trial for the reasons stated in that opinion, 280 N.C. 42, 185 S.E. 2d 123 (1971).

Upon motion by defendant, the case was transferred to Union County for retrial. At his retrial, upon a plea of not guilty, defendant was again convicted of murder in the first degree and sentenced to death.

The State's evidence tends to show that on 5 January 1971 James Alexander Howell and his wife lived on Route 4 near Albemarle in Stanly County. Mr. Howell worked six days a week from 6 a.m. until 6 p.m. as manager of a store. On the morning in question he arose about 5 a.m., ate breakfast with his wife, and left the house to go to the store. When Mrs. Howell failed to hear the truck door slam and failed to hear the motor start, she became concerned and went to the front door to investigate. After calling to her husband and receiving no answer, she telephoned a neighbor, Gene Almond. When Mr. Almond arrived at the Howell home they discovered Mr. Howell lying facedown alongside his truck. The truck door on the driver's side was open and Mr. Howell's right foot was inside the truck. He had been shot and died shortly thereafter. An autopsy revealed that death resulted from a shotgun wound in the left chest.

Officers were called and arrived at the Howell home at 6:30 a.m. Their investigation revealed blood on the back of the front seat and inside the cab and shoe tracks in the vicinity and around the house. A Halloween mask was found on an old sawmill road about 145 feet from the house.

Tommy Clinton Peguese, a long-time friend and acquaintance of defendant, testified that on Sunday, 3 January 1971, he saw defendant at defendant's home in Albemarle with Tracy Baucom and Edward Richardson; that they rode around Albemarle in a car during which time defendant said he needed some money and Richardson asked him where he planned to get it; that defendant said "he knew a man who either owned a

chicken place or owned a store and run a chicken place and cashed checks" near the Endy vicinity; that the man would have from $800 to $2,000 and he was going to carry an iron pipe with him and hit him on the head with it; that "he didn't give us an exact date or anything, but said it would be between 5:00 and 6:00 o'clock in the morning"; that he asked defendant if he was serious and if he intended to carry a gun, "and that's when he showed me the sawed-off shotgun."

This witness further testified that several weeks later he saw defendant in Wadesboro in front of the Burmese Lounge and asked him "if he had done what he had told me a few weeks ago and he looked at me and told me to keep my mouth closed and that was all."

Tracy Baucom testified that he was with Tommy Peguese, Edward Richardson and defendant on Sunday in early January 1971 when they rode around Albemarle in Tommy Peguese's car; that defendant "was talking about the deal. Something about some man that had some money or something. I think he worked at that chicken place. He said the man kept some money or had some at his house or somewhere . . . and he leaves home early in the morning going to work and supposed to be some kind of deal pulled off." This witness further testified that he saw defendant two or three weeks later and "defendant said something about that deal or something didn't go right or something. I don't know what he said, he just said it didn't go right. He said something didn't go right and someone had to shoot or something and he didn't call any particular name or who it was. He did not say who had been shot."

Clarence Parsons testified that he managed the Burmese Lounge in Wadesboro; that he bought a sawed-off shotgun from defendant about the middle of January 1971 for $10.00, carried the gun home and kept it until he gave it to the sheriff and the SBI agent. Frank Spencer, an employee at the Burmese Lounge, corroborated this testimony.

The testimony of Ralph McSwain, Sheriff of Stanly County, and SBI Agent Coppley tends to show that they went to the Howell residence at 6:10 a.m. and 6:30 a.m., respectively, on 5 January 1971 where they saw Mr. Howell's body and saw shoe impressions near the porch column and in tracks outside the dining room. On 19 February 1971 at 5:30 a.m. defendant was arrested at his home on a capias incident to a worthless

check charge. The sheriff had obtained the shotgun the evening before, had interviewed the two witnesses in Wadesboro, and had obtained a warrant charging defendant and Craven Turner, Jr. with Mr. Howell's murder.

Following defendant's arrest, he was taken to the Stanly County Jail where the murder warrant was served on him and he was advised of his constitutional rights in full compliance with *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed. 2d 694, 86 S.Ct. 1602 (1966). Defendant said he understood his constitutional rights and denied knowing anything about Mr. Howell's murder. Sheriff McSwain thereupon left and went to the mill where Craven Turner, Jr. worked on the nightshift and arrested him on the murder charge at 8:05 a.m. Turner was fully advised of his constitutional rights, waived counsel, and made a full confession. (See R pp 20-22 in *State v. Craven Turner, Jr.*, Case No. 6, Spring Term 1973.) Thereafter, about 10 a.m., the sheriff returned to the room where defendant was confined, again repeated the *Miranda* warnings and defendant again stated he understood his rights. Defendant was then told that his co-defendant Craven Turner, Jr. would be brought into the room and would make a statement in the presence of defendant and that defendant did not have to say anything during or after Turner's statement. Turner was brought into the room and stated in the presence of the defendant and others that he and defendant Blackmon had gone to the Howell residence on the morning of 5 January 1971 and Blackmon had shot Mr. Howell. Blackmon said to Turner, "You got the gun out of the car. You say I shot him? Well, I say you shot him." Turner was immediately taken from the room and Sheriff McSwain asked defendant Blackmon, "Do you care to make any further statement?" The defendant replied, "Well, I'm just going to tell you how it was."

Defendant Blackmon then made a detailed statement concerning the events which occurred at the Howell home on 5 January 1971. In a continuous narrative he said that about a month before the killing Turner said he knew how to get some money, knew a man who carried money to cash checks on Tuesdays. On the day before the robbery Turner drove the defendant by the Howell house three times. Continuing his statement, defendant said Turner borrowed his shotgun on Saturday before the killing and picked up the defendant about 4:30 a.m. on the morning of 5 January 1971. They drove to a

point near the Howell residence in Turner's Chevelle automobile, parked the car on a secondary road, and Turner put on a Halloween mask while defendant covered his face with a paper bag. They walked across a field to the Howell home where defendant stayed in the edge of some woods while Turner approached the house and returned in a few minutes to state that the Howells were eating breakfast. Turner concealed himself in the shrubbery and very soon Mr. Howell opened the door and came out on the front porch where he poured water out of a container and threw the container on the ground. Shortly thereafter, defendant heard a shot and Turner came running from the house and stated, "The old man went for his pocket and I had to shoot." They both ran across the field to the car, Turner falling in the field where he lost the Halloween mask and defendant falling in the creek "and this is why mud was on the gun." Defendant heard on the radio about noon that Mr. Howell was dead. When he later saw Turner and informed him of that fact, Turner said, "He's just dead. It was either him or me."

Defendant said he sold the sawed-off shotgun to Clarence Parsons in Wadesboro for $10.00. He was shown the shotgun and Halloween mask and stated that the gun was the weapon used at the Howell residence and the mask was the one worn by Turner during the robbery attempt. Defendant also identified the pair of tennis shoes he was wearing on the morning of the shooting.

Thereafter defendant voluntarily accompanied the officers to the scene of the crime, showed them the route he and Turner had followed, where they parked the car, the bush where defendant stood while Turner went around the Howell house, and the places where he and Turner fell while fleeing the scene.

The State offered evidence that Blackmon was twenty-five years old and Turner twenty-eight years old at the time Mr. Howell was killed.

Defendant interposed timely objection to the foregoing testimony of Sheriff McSwain and SBI Agent Coppley whereupon the jury was excused and the court conducted an extensive voir dire. Evidence for the State on the voir dire was in substantial accord with the foregoing narration.

Defendant testified on voir dire that the sheriff and SBI Agent Coppley and a city policeman came to his home on the

morning of 19 February 1971 about 5:30 a.m. and arrested him on a capias for a worthless check; that he was taken downtown to jail where the murder warrant was read to him; that he told the sheriff, "I won't answer nothing until I get a lawyer"; that Sheriff McSwain said, "Ain't no lawyer coming down here this time of morning, they in bed"; that he was not advised of his constitutional rights; that he was shown the shotgun and told the officers he owned it at one time and sold it to Clarence Parsons; that he called his wife about 9:30 a.m. and told her to inform his mother and sister that he needed a lawyer. He denied that Craven Turner, Jr. stated in his presence that he, Blackmon, shot Mr. Howell and asserted that the officers left defendant and Turner in the room together alone for about fifteen minutes. He denied that the sheriff asked him if he cared to make any further statement, denied that he made an incriminating statement, and denied that he volunteered to go with the officers to the scene of the crime. He admitted that he completed the eleventh grade in school, could read and write very well, and was not forced in any way to say anything and was made no promises. He admitted he had served two prison sentences, six months for larceny and fifteen months for breaking probation, and said he was represented on one occasion by Lawyer Pat Taylor who was employed by his mother and on another occasion by Lawyer Avery Hightower, employed by himself. He admitted that he pleaded guilty in Cumberland County on two occasions for escape. He stated that on 19 February 1971 he was employed and earning $100.00 a week. He said he now knows his constitutional rights but did not know them on 19 February 1971.

At the conclusion of the voir dire the trial court made detailed findings of fact. The court found, *inter alia*, that defendant was fully advised of his constitutional rights and said that he understood them; that immediately after defendant was so advised, Sheriff McSwain asked him about Mr. Howell's murder and defendant said he didn't know anything about it; that the sheriff thereupon left about 6:30 a.m. and posed no further questions; that during the sheriff's absence SBI Agent Coppley made one effort to interview defendant on the subject, and defendant said he didn't know anything about the matter; that no further questions were posed by Agent Coppley or any other officer until Sheriff McSwain returned about 10 a.m., again advised defendant of his constitutional rights and told him his co-defendant Craven Turner, Jr. would be brought into

the room and would make a statement in defendant's presence but further advised defendant that he did not have to say anything during or after Turner made said statement; that Turner was brought into the room and said that he and the defendant Blackmon had gone to the Howell residence and that the defendant had shot Howell; that at that point the defendant Blackmon said to his co-defendant Turner, "You say I shot him?" and Craven Turner, Jr. replied, "Yes," and then the defendant Blackmon said, "I say you shot him"; that these words by the defendant Blackmon were made in response to the statement of Craven Turner, Jr. and were not the result of any questions put to him by any officer; that they were spontaneous in character and were made immediately after the statement by Craven Turner, Jr. to the effect that this defendant, Johnny James Blackmon, had shot Mr. Howell.

The trial court further found as a fact that defendant told Craven Turner, Jr., "You got the gun out of the car" and that this statement was not elicited by any questioning by the officers but was made in response to Turner's statement; that after Turner was removed from the room Sheriff McSwain asked the defendant, "Do you care to make any further statement?" and defendant replied, "I'll just tell you how it was." The court then found that defendant made the narrative statement detailed above.

The court found as a fact that the defendant was twenty-five years of age and had finished the eleventh grade in school; that he had held positions as a shipping clerk, as a truck driver, and could read and write very well; that he had been involved in a number of criminal cases, had been convicted of shoplifting, five counts of larceny, two escapes, and several motor vehicle violations, as a result of which he had been represented by competent counsel on at least two occasions prior to 19 February 1971 and had thus had considerable experience with criminal courts and criminal procedure; that at no time did defendant indicate that he wanted an attorney present or request anyone to obtain an attorney for him, and at no time did he affirmatively state that he did not want a lawyer.

Based upon the findings of fact and the totality of the circumstances, the trial court concluded as a matter of law that defendant, after being fully advised of his constitutional rights, made the incriminating statements freely, understandingly and voluntarily without compulsion, duress or promise of

leniency; that defendant by his words and deeds expressly waived his right to counsel and to keep silent by knowingly and intelligently making a free and voluntary confession immediately after he was advised of his rights, "said confession having been spontaneously made in response to a statement made in his presence by co-defendant Craven Turner, Jr."

Defendant's objection to the testimony of Sheriff McSwain and Agent Coppley concerning his incriminating statement was thereupon overruled and said witnesses were permitted to testify before the jury as above narrated.

At the conclusion of the State's evidence, defendant's motion for judgment of nonsuit was denied. The jury was excused and defendant was fully advised of his right to testify and offer evidence in his own behalf. Being so advised, defendant knowingly and understandingly informed the court that he had decided not to testify and that there were no witnesses he desired to call in his behalf. He rested and renewed his motion for judgment of nonsuit which was denied.

The jury convicted defendant of murder in the first degree, and he was sentenced to death. He appealed to the Supreme Court assigning errors discussed in the opinion.

*Robert Morgan, Attorney General; Andrew A. Vanore, Jr., Deputy Attorney General; Edwin M. Speas, Jr., Associate Attorney, for the State of North Carolina.*

*Elton S. Hudson of Hopkins and Hudson, Attorney for defendant appellant.*

*Norman B. Smith and Daniel H. Pollitt, Attorneys for the North Carolina Civil Liberties Union Legal Foundation, Inc., Amicus Curiae.*

HUSKINS, Justice.

Defendant assigns as error the admission of his inculpatory statements made while in custody and without benefit of counsel. He contends the incriminating statements are inadmissible because he was indigent at the time, charged with a capital offense, and had not waived his constitutional right to the presence and assistance of counsel. He relies on G.S. 7A-457(a) as interpreted and applied in *State v. Lynch*, 279 N.C. 1, 181 S.E. 2d 561 (1971), and on *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed. 2d

694, 86 S.Ct. 1602 (1966), as interpreted and applied by this Court in *State v. Blackmon,* 280 N.C. 42, 185 S.E. 2d 123 (1971).

The trial court found as a fact on voir dire that defendant was twice advised of his constitutional rights as required by *Miranda,* initially about 6 a.m. following his arrest and again at approximately 10 a.m. on 19 February 1971. Each time defendant said he fully understood those rights. The trial court further found that following the second *Miranda* warning at 10 a.m., Sheriff McSwain told defendant that his co-defendant Craven Turner, Jr. would be brought into the room and would make a statement, and advised defendant that he did not have to say anything during or after Turner made his statement. Defendant indicated that he understood. Co-defendant Turner was then brought into the room and in the presence of defendant Blackmon, the sheriff, and two other law enforcement officers, made a statement to Blackmon to the effect that he and Blackmon had gone to the Howell residence and that Blackmon had shot Howell. In response to that statement defendant Blackmon said to Turner, "You say I shot him? I say you shot him. You got the gun out of the car." Co-defendant Turner was then taken from the room and immediately thereafter Sheriff McSwain said to defendant Blackmon, "Do you care to make any further statement?" Defendant then said, "I'll just tell you how it was." Defendant then made a detailed statement concerning the events at the James Howell home on 5 January 1971. This statement was a continuous narration, punctuated only by questions from Sheriff McSwain to help keep matters in chronological order. Based on these findings at the conclusion of an extensive voir dire, and in light of the total circumstances, the court concluded "[t]hat the defendant, Johnny James Blackmon, by his words and by his deeds expressly waived these rights on this occasion; that his waiver thereof was freely, understandingly and voluntarily made and that it was done without undue influence, compulsion, duress and without any promise of leniency."

[1] The findings of fact are supported by competent evidence and are conclusive on appeal. *State v. McRae,* 276 N.C. 308, 172 S.E. 2d 37 (1970); *State v. Gray,* 268 N.C. 69, 150 S.E. 2d 1 (1966). Consequently, it is established that defendant was fully advised and understood that he had the right to remain silent; that anything he said could and would be used against him in a court of law; that he had the right to have a lawyer

present during interrogation and to confer with counsel before any questioning if he so desired; that if he could not hire his own attorney the State would appoint and pay a lawyer to represent him; and that if he chose to answer questions or make a statement he could stop talking at any time. The findings further establish that defendant never requested the presence of counsel but never said he did not want a lawyer. Finally, the findings establish that his later statement was not coerced but was freely and voluntarily made. These facts, however, are not sufficient to constitute a waiver of counsel. There is neither evidence nor findings of fact to show that defendant expressly waived his right to counsel, either in writing or orally, within the meaning of *Miranda* on which our decision in *State v. Blackmon*, 280 N.C. 42, 185 S.E. 2d 123 (1971), is based. "An individual need not make a pre-interrogation request for a lawyer. While such request affirmatively secures his right to have one, his failure to ask for a lawyer does not constitute a waiver. No effective waiver of the right to counsel during interrogation can be recognized unless specifically made after the warnings we here delineate have been given." *Miranda v. Arizona, supra*. Silence and waiver are not synonymous. "Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver." *Carnley v. Cochran*, 369 U.S. 506, 8 L.Ed. 2d 70, 82 S.Ct. 884 (1962). We said as much on defendant's previous appeal. *State v. Blackmon, supra* [280 N.C. 42, 185 S.E. 2d 123 (1971)].

Although our previous decision in this case negates effective waiver of counsel, other jurisdictions have held somewhat similar factual circumstances to constitute waiver. *See, e.g., Mitchell v. United States*, 434 F. 2d 483 (D.C. Cir.), *cert. denied*, 400 U.S. 867 (1970); *United States v. Hilliker*, 436 F. 2d 101 (9th Cir. 1970), *cert. denied*, 401 U.S. 958 (1971); *United States v. Hayes*, 385 F. 2d 375 (4th Cir. 1967), *cert. denied*, 390 U.S. 1006 (1968); *People v. Johnson*, 70 Cal. 2d 541, 450 P. 2d 865, 75 Cal. Rptr. 401, *cert. denied*, 395 U.S. 969 (1969); *People v. Higgins*, 50 Ill. 2d 221, 278 N.E. 2d 68, *cert. denied*, 409 U.S. 855 (1972); *State v. Kremens*, 52 N.J. 303, 245 A. 2d 313 (1968); *State v. Alewine*, 474 S.W. 2d 848 (Mo. 1971); *see generally Waiver of Rights in Police Interrogations: Miranda in the Lower Courts*, 36 U. Chi. L. Rev. 413, 421-430 (1969).

[2] Even so, *Miranda* warnings and waiver of counsel are only required where defendant is being subjected to custodial interrogation. A volunteered confession is admissible by constitutional standards even in the absence of warning or waiver of rights. *Miranda v. Arizona, supra; State v. Wright,* 274 N.C. 84, 161 S.E. 2d 581 (1968); *State v. Haddock,* 281 N.C. 675, 190 S.E. 2d 208 (1972). While clearly defendant was in custody at the time he made the incriminating statements, his statements were not made in response to police "interrogation," as that word is defined in *Miranda,* but were more in the nature of volunteered assertions and narrations.

The United States Supreme Court said in *Miranda:*

"By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. . . . Any statement given freely and voluntarily without any compelling influence, is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

Measured by *Miranda* standards, we hold that defendant's initial response to co-defendant Turner's statement was spontaneous and volunteered and was not elicited by police interrogation. Defendant's further narrative was in response to a neutral question by Sheriff McSwain. As we said in *State v. Haddock, supra:*

"Volunteered statements are competent evidence, and their admission is not barred under any theory of the law, state or federal. *State v. Stepney,* 280 N.C. 306, 185 S.E. 2d 844 (1972); *State v. Ratliff,* 281 N.C. 397, 189 S.E. 2d 179 (1972); *State v. Chance,* 279 N.C. 643, 185 S.E. 2d 227 (1971); *Miranda v. Arizona, supra.* And a voluntary in-custody statement does not become the product of an 'in-custody interrogation' simply because an officer, in the course of defendant's narration, asks defendant to explain or clarify something he has already said voluntarily."

State v. Blackmon

In *Howell v. State,* 5 Md. App. 337, 247 A. 2d 291 (1968), *cert. denied,* 396 U.S. 907 (1969), after defendant had been given the *Miranda* warnings, he stated that he did not wish to be questioned. Approximately an hour and a half later, while being "processed" at the police station, he was told in narrative form certain incriminating statements that his accomplice had made about him. Defendant immediately responded with a statement which was offered in evidence at his trial. It was held that the statement did not result from an "interrogation" but was more in the nature of volunteered information.

In *State v. Fletcher* and *State v. St. Arnold,* 279 N.C. 85, 181 S.E. 2d 405 (1971), the police took the robbery victim, Myers, into defendant's jail cell where a conversation ensued. Myers was allowed to testify at trial: "I asked St. Arnold what did they have against me to rob me; he answered, 'We have nothing against you. We were broke and needed some money.'" This Court held that the statement made to Myers by St. Arnold was not the result of police custodial interrogation and was properly admitted in evidence despite the absence of *Miranda* warnings.

So it is here. There is no evidence in this record of any interrogation or other police procedure tending to overbear the will of the accused in a manner condemned by *Miranda.* Defendant spoke in the voluntary exercise of his own will and without the slightest compulsion of in-custody interrogation procedures. His statements were therefore properly admitted into evidence as volunteered statements made under circumstances requiring neither warnings nor the presence of counsel.

Whether the trial judge erred in finding as a fact that defendant, who was earning $100.00 per week, was not indigent on 19 February 1971, we need not now decide. An indigent's right to or waiver of counsel under G.S. 7A-457(a) does not arise and is not involved with respect to volunteered statements. Defendant's first assignment of error is overruled.

Defendant was tried, convicted and sentenced under G.S. 14-17 which provides in pertinent part as follows:

"A murder which shall be perpetrated . . . by any . . . willful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or other felony, shall be deemed to be murder in the first degree and shall

be punished with death: Provided, if at the time of rendering its verdict in open court, the jury shall so recommend, the punishment shall be imprisonment for life in the State's prison, and the court shall so instruct the jury."

[3]   Upon the trial of this case the judge instructed the jury, among other things, as follows: "Ladies and gentlemen, you may return one of three verdicts: you may find the defendant guilty as charged—guilty of murder in the first degree, or you may find the defendant guilty of murder in the first degree with a recommendation that punishment be life imprisonment, or you may find the defendant not guilty." The jury returned a verdict of guilty of murder in the first degree with no recommendation and defendant was sentenced to death. He assigns as error the denial of his motion to reduce the judgment from death to life imprisonment. This assignment is sustained. The jury was permitted to exercise its discretion and choose between life and death, a procedure held unconstitutional by the Supreme Court of the United States in *Furman v. Georgia,* 408 U.S. 238, 33 L.Ed. 2d 346, 92 S.Ct. 2726 (1972). In *State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19 (1973), we severed the offending discretionary proviso from the remainder of G.S. 14-17 leaving the remainder of the statute intact with death as the mandatory punishment ·for murder in the first degree. However, for reasons there stated, we held that the mandatory death penalty for capital offenses "may not be constitutionally applied to any offense committed prior to the date of this decision but shall be applied to any offense committed after such date." *State v. Waddell, supra.* The *Waddell* decision was filed on 18 January 1973. This offense was committed on 5 January 1971. Thus defendant's death sentence cannot stand. The case must be remanded to the Superior Court of Union County for imposition of a sentence of life imprisonment in accord with previous decisions. *State v. Waddell, supra; State v. Miller,* 281 N.C. 740, 190 S.E. 2d 841 (1972) ; *State v. Hamby* and *State v. Chandler,* 281 N.C. 743, 191 S.E. 2d 66 (1972) ; *State v. Chance,* 281 N.C. 746, 191 S.E. 2d 65 (1972) ; *State v. Westbrook,* 281 N.C. 748, 191 S.E. 2d 68 (1972) ; *State v. Doss,* 281 N.C. 751, 191 S.E. 2d 70 (1972).

In an excellent brief for the North Carolina Civil Liberties Union Legal Foundation, Inc., as amicus curiae, the following question is presented for consideration by the Court: "Whether *Furman v. Georgia,* 408 U.S. 238 (1972), requires that life imprisonment be the sole punishment for previously capital crimes

in North Carolina unless and until the Legislature acts to revise the present statutes." For reasons stated in the brief the Court is urged to reconsider that aspect of its decision in *State v. Waddell, supra,* which holds that the penalty for capital crimes in North Carolina after January 18, 1973, is mandatory death. It is skillfully argued that life imprisonment should be declared to be the sole penalty for the four previously capital crimes in this State—murder, arson, burglary and rape—unless and until the Legislature acts to revise the present statutes.

It suffices to say, while the severability of G.S. 14-17 is adequately documented in *Waddell* and no persuasive reason appears why that decision should be disturbed, the defendant in this case is not subject to the death penalty. The Court is therefore not inclined to renew the debate on capital punishment in a case in which that penalty is not involved.

For the reasons stated, the judgment of the Superior Court of Union County insofar as it imposed the death penalty upon this defendant is reversed. The case is remanded to the Superior Court of Union County with directions to proceed as follows:

1. The presiding judge of the Superior Court of Union County will cause to be served on the defendant Johnny James Blackmon, and on his counsel of record, notice to appear during a session of said Superior Court at a designated time, not less than ten days from the date of the notice, at which time, in open court, the defendant Johnny James Blackmon, being present in person and being represented by his counsel, the presiding judge, based on the verdict of guilty of murder in the first degree returned by the jury at the trial of this case at the 28 August 1972 Session, will pronounce judgment that the defendant Johnny James Blackmon be imprisoned for life in the State's prison.

2. The presiding judge of the Superior Court of Union County will issue a writ of habeas corpus to the official having custody of the defendant Johnny James Blackmon to produce him in open court at the time and for the purpose of being present when the judgment imposing life imprisonment is pronounced.

REMANDED FOR JUDGMENT.

Justice HIGGINS concurs in result.

Chief Justice BOBBITT and Justice MOORE dissent.