**Johnny James BLACKMON,
Petitioner,**

v.

**Dr. Stanley BLACKLEDGE, Warden, Central Prison, Raleigh, North Carolina,
et al., Respondents.**

**No. C-C-83-8.**

United States District Court,
W. D. North Carolina,
Charlotte Division.

June 12, 1975.

Richard N. League, Asst. Atty. Gen., N. C. Dept. of Justice, Raleigh, N. C., for respondents.

## ORDER GRANTING WRIT OF HA-BEAS CORPUS

McMILLAN, District Judge.

Johnny James Blackmon, a North Carolina state prisoner serving a life term for murder, seeks habeas corpus upon the claim that incriminating in-custody statements made by him to police officers were invalid under the doctrine of Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966), because they were in response to an illegal interrogation. He has exhausted state remedies and the claim is properly before this court.

Testimony at the trial showed that on January 5, 1971, James Alexander Howell, of Endy, Stanly County, North Carolina, was killed by a shotgun blast in the carport of his home some time after 5:00 A.M. He operated the Endy Feed and Supply Store (the "chicken place"), and had a reputation for keeping large sums of money at his home. Investigating police officers arrived about 6:30 A.M. They made plaster casts of some shoe prints found in the dirt near the house. These were identified as sole prints of Converse All Star tennis shoes, but not as the prints of any particular pair of shoes. The defendant was wearing Converse All Star tennis shoes when he was arrested six weeks later. Tommy Peguese (R. 24) testified that on a Sunday in early January, 1971 (apparently January 3rd), he had seen the petitioner at Albemarle and that petitioner said he was going to rob the man at Endy who ran a "chicken place" and cashed checks. He said that petitioner said he planned to do this between five and six o'clock in the morning and that he would hit the deceased over the head with a pipe when he came out of the house. The petitioner displayed a sawed-off shotgun to the witness. Several weeks later Peguese inquired of the petitioner whether he had done "what he had told me a few weeks ago and he looked at me and told me to keep my mouth closed and that was all." (Later the witness reported these events to the police.) About the middle of January, a week or ten days after the crime, petitioner sold the sawed-off shotgun to one Clarence Parsons for $10.00. The shotgun was determined to be one which could have fired the fatal shot. An un-fired twelve-gauge shotgun shell which would fit the gun was found in the petitioner's house when he was arrested on February 18, 1971. There was no ballistics testimony that in fact the fatal shell *was* fired from that particular gun, and the nature of a shotgun and its shells appears to be such that no such positive testimony is possible.

Tracy Baucom testified (R. 50) that he overheard the Sunday night conversation between petitioner and Tommy Peguese. Two or three weeks later he said he saw the petitioner again and that the petitioner "said something about that deal or something didn't go right. He said something didn't go right and someone had to shoot or something and he didn't call any particular name or who it was. He did not say who had been shot. And he did not say who did the shooting."

Aside from the above evidence there was little, if anything, to connect defendant with the crime *except* the in-custody statements of petitioner himself, and those in-custody statements and the way they were obtained are the subject of this petition.

Six weeks after the crime, Blackmon was arrested. Apparently possessed of some information implicating Blackmon, the Sheriff of Stanly County obtained a warrant for his arrest upon charge of murdering James Howell. However, the murder warrant was not publicized. On February 19, 1971, about 5:30 A.M., the Sheriff and other officers arrested Blackmon at his home in Albermarle, North Carolina. The ostensible charge under which the arrest was made was not the murder charge, but was an old worthless check charge on which he had already been arrested once the same week; the worthless check charge was a ruse to support Blackmon's arrest with-

out publicity for the murder warrant until his apparent accomplice, Craven Turner, could be arrested later the same morning.

On *voir dire* challenge to the introduction of his incriminating statement Blackmon denied that he had received any *Miranda* warning and said (R. 107) that he told the officers on February 19th when arrested that "I won't answer nothing till I get a lawyer." The trial court found, however, upon competent evidence, that Blackmon was given the *Miranda* warning; that he was told he had the right to remain silent, to employ a lawyer or to have a lawyer appointed if he could not afford one, and the right to stop answering questions at any time. The trial court further found (R. 131) that Blackmon said he understood his constitutional rights but that he did not know anything about the murder.

Agent Jack Coppley of the State Bureau of Investigation remained in Blackmon's company from the time of the arrest until after 8:00 A.M. and, in addition to the original interrogation, he made at least one further effort to interrogate Blackmon. However (R. 132), the officers operated under a continuing intention to question Blackmon further after they had arrested and interrogated Craven Turner.

About ten o'clock a dramatic confrontation was arranged between Craven Turner and petitioner Blackmon. Sheriff McSwain revisited Blackmon in the jail, repeated the *Miranda* warnings, and told Blackmon that he was bringing Craven Turner in to make a statement, but that Blackmon did not have to say anything in response. Turner was then brought in and he made a statement in the presence of the petitioner and several law enforcement officers that he, Turner, and petitioner Blackmon had gone to the deceased's residence and that the petitioner Blackmon had shot Howell.

Faced with this accusation Blackmon responded: "You say I shot him?

Well, I say you shot him," or words to that effect.

There followed a lengthy colloquy and ultimately a detailed statement by Blackmon in which he maintained that although he and Turner had planned a robbery they had planned no murder, and that the actual killing was done by Turner out of Blackmon's sight and presence and that Turner later said he had to do it in self-defense.

The court found petitioner's statements to have been voluntarily made, and allowed evidence of all his statements and Craven Turner's accusations to be offered before the jury.

Craven Turner did not testify at the trial.

Therefore, the admission of the statement and its attendant circumstances carried with it to the jury Craven Turner's accusation, not subject to cross-examination, that petitioner had done the killing.

Without extended debate as to the weight of the confession, I think it clear that a conviction of first degree murder would have been very difficult to obtain without the admission of the incriminating statements by Turner and the petitioner.

Blackmon was tried twice. In the first trial, in Stanly County, the in-custody statements were admitted against him; he was convicted of first degree murder and was sentenced to death. The Supreme Court of North Carolina on appeal ruled that the trial court had erred in holding that Blackmon had waived his right to counsel and they held that Miranda v. Arizona warranted a new trial, State v. Blackmon, 280 N.C. 42, 185 S.E.2d 123 (1971).

The re-trial took place at the August 28, 1972, session of *Union* County Superior Court. Again Blackmon's statement was admitted in evidence. He was again convicted of first degree murder and again appealed. The Supreme Court, in light of Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d

346 (1972), and State v. Waddell, 282 N.C. 431, 194 S.E.2d 19 (1973), remanded the case for resentencing with direction that the death sentence be replaced by a sentence of life imprisonment, State v. Blackmon, 284 N.C. 1, 199 S.E. 2d 431 (1973).

However, the conviction itself was upheld. The court ruled that *Miranda* did not apply because Blackmon's statement had been voluntary and spontaneous rather than in response to a police "interrogation."

[1] With fullest respect for the opinions and judgments of the able trial judge and Supreme Court of North Carolina, this court is unable to agree with their view of the legal status of Blackmon's utterances. Blackmon had been under arrest for four and one-half hours and had been under interrogation for a good part of that time. He had denied involvement in the crime. His right to counsel before talking had been recognized. The gambit of bringing Turner in without warning and having him accuse Blackmon of the murder in a face to face confrontation was clearly an interrogatory technique calculated to pry some damaging statement out of Blackmon. Because the statement he made was the product of this interrogatory action rather than of his independent initiative, it cannot be deemed spontaneous, and *Miranda* applies. United States v. Bensinger, 463 F.2d 576 (7th Cir. 1972), cert. denied, 409 U.S. 932, 93 S.Ct. 239, 34 L.Ed.2d 186 (1972); United States v. Phelps, 443 F.2d 246 (5th Cir. 1971); United States v. Barnes, 432 F.2d 89 (9th Cir. 1970).

The fact that Blackmon made a statement after having been informed of his *Miranda* rights does not mean that he intended to waive those rights. On the first appeal the North Carolina Supreme Court held, and in dictum on the second appeal it said, that in fact Blackmon had *not* waived his right to have counsel present when Turner made his statement and when Blackmon responded

to it. The North Carolina Supreme Court cited Carnley v. Cochran, 369 U.S. 506, 516, 82 S.Ct. 884, 890, 8 L.Ed.2d 70 (1962), for the following proposition:

"Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver."

In *Miranda* itself the Supreme Court of the United States said,

" . . . a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained . . . ." Miranda v. Arizona, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966).

The record in this instance does not support a finding of waiver of the right to counsel. Because Blackmon's right to have counsel present was not waived, the statement was legally involuntary, and its admission was constitutional error.

A case substantially in point is United States v. Clark, 499 F.2d 802 (4th Cir. 1974). Clark was arrested about 4:30 in the morning, was charged with bank robbery and was given his *Miranda* warnings by the F.B.I. agents. He said he knew nothing of the robbery and wanted a lawyer. Some three hours later the same F.B.I. agents returned and resumed the interrogation and told him that his friend and suspected accomplice had made some serious allegations against him. Clark then began talking and made a number of incriminating statements. The court addressed itself directly to whether the waiver of counsel on the second interview was voluntarily made. While recognizing that there may be a waiver after an original claim of right to counsel, the court placed a heavy burden upon the government to demonstrate the voluntariness of the waiver. Quoting from United States v.

Crisp, 435 F.2d 354, 357 (7th Cir. 1970), the Court said:

> "[o]nce the privilege has been asserted, . . . an interrogator must not be permitted to seek its retraction, total or otherwise."

Continuing, the Fourth Circuit observed:

> "Less than four hours had elapsed between the time Clark stated that he wanted to talk with an attorney before answering any questions about the robbery and the time he confessed; obviously this was an insufficient period of time for Clark, who was incarcerated, to retain counsel. At the very least, the agents should have afforded Clark sufficient time to employ and consult with counsel before *they initiated* any subsequent interview." (Emphasis in original, 499 F.2d 802, 807.)

The error in admitting testimony relating Blackmon's in-custody statement was not harmless. The Supreme Court in Chapman v. California, 386 U. S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), said:

> " . . . before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."

Such a declaration cannot be made. So incriminating was Blackmon's statement that to hold that its admission did not affect his case adversely would be unthinkable.

It is therefore ordered that the conviction be set aside and that the respondents either allow the petitioner a new trial or release him, and that they advise this court by July 7, 1975, which course of action they have decided to follow.

If a new trial is decided upon, it is further ordered that the new trial take place in a county other than Union or Stanly, at a time not exceeding ninety (90) days from the entry of this order.